TERRY LA ROTUNDA *et al.*, Plaintiffs-Appellants, *v.* ROYAL GLOBE INSURANCE COMPANY *et al.*, Defendants-Appellees.

First District (3rd Division)   No. 78-2140

Opinion filed May 7, 1980.—Modified on denial of rehearing September 3, 1980.

Smith and Munson, Ltd., of Chicago (James G. Meyer, of counsel), for appellants.

Baker and McKenzie, of Chicago (Francis D. Morrissey, John T. Coleman, and Edward J. Zulkey, of counsel), for appellees.

Mr. JUSTICE SIMON delivered the opinion of the court:

After an automobile accident near her land, the insured was sued. The insurer received notice of the suit, made its investigation, and refused to defend, taking the position that the policy did not cover the accident. The insurer also refused to settle the case on the insured's behalf. The insured was represented at trial by her own lawyer and lost.

The assigns of the insured now sue the insurer, claiming that it is estopped from denying coverage because it failed to defend the case under a reservation of rights or seek a declaratory judgment that there

was no coverage. They also seek to go to trial before a jury on the issue of whether the refusal to settle was negligent, fraudulent, or in bad faith. We conclude that the circuit court erred in entering summary judgment in favor of the insurer. The insurer was obliged to defend where the allegations of the complaint did not clearly show that the claim was beyond the policy coverage, and the question of negligence, fraud or bad faith was for a trier of fact to determine.

The pleadings, affidavits and depositions on file reveal that on May 2, 1965, a car driven by Richard LaPorte smashed into a vehicle containing several persons referred to in this opinion as the La Rotunda plaintiffs. The collision occurred on a bridge that carried Route 83 over the Des Plaines River and some railroad tracks. Explanations for the accident varied, but those in the La Rotunda vehicle said that their visibility had been obscured by smoke drifting over the bridge from low land between the tracks and the river.

This land was owned by Irla Habada as beneficiary of a land trust. She and her husband lived about 1.5 miles away in Hinsdale. She had purchased the land, 22.5 acres in all, in 1960. At the time, the Habada's home in Hinsdale was insured by defendants Royal Globe and London and Lancashire (Royal Globe). Because the newly purchased land was vacant, Mrs. Habada did not obtain additional insurance, but she did discuss the purchase with her insurance agent, who also happened to be president of her bank, though he was not the agent from whom the Habadas had initially purchased the defendants' policy. The policy for the home was in effect on the day of the accident.

The 22.5 acres was covered with trees and was often flooded. The previous owner had kept some old cars on the property, and when Mrs. Habada purchased it the Cook County sheriff was allowed to place his junked vehicles there as well. About 1962 Mr. Habada allowed a man to purchase the worn-out cars and begin a junkyard. Approximately half the 22.5 acres was leased, but the lease was oral and there was no clear line of demarcation setting its boundaries. Mr. Habada often dumped rubbish and fill on the lowest sections of the land; by 1965 he regularly allowed wrecking companies to dump waste and refuse on the property as landfill and accepted up to $5 for each load, but some loads were accepted without charge. A bulldozer on the site flattened out the fill to build up the river bank, yet parts of the land remained heavily wooded. Apparently, some of the refuse from the dumping operations and perhaps from the junkyard found its way into the wooded section.

A fire which had been burning on the land for several days was still burning on the day of the accident. It was not in the junkyard, but the record is not clear whether the fire was in the landfill area or in the woods. The Habadas were raking leaves in the front yard of their house when the accident occurred. They heard the sirens of the rescue vehicles but

thought little about them since accidents were common on the bridge. The next day Mr. Habada spoke with the junkyard operator, who had witnessed the crash. He said that smoke from the fire had not blown across the highway. The Habadas later learned that the weather bureau said that winds that day blew from a direction which would not have obscured the highway. If it had, they themselves would have seen the smoke, since they were downwind from the fire, and the bridge was between their house and the fire.

It came as a surprise, then, when the junkyard operator, Mr. Habada and the Habadas' daughter, who had, after the accident, been named the beneficiary of the land trust, were sued by the La Rotunda plaintiffs on March 1, 1967. The complaint did not name Mrs. Habada. It alleged that Mr. Habada and the junkyard operator ran a junkyard and a refuse dump, negligently burned refuse and allowed the smoke to drift over the highway, causing the accident.

Mrs. Habada sent the complaint and summons to her attorney, but not to her insurance agent. She "guessed" that she discussed the suit with her insurance agent within 2 years after the suit was filed, but could not remember if she ever showed him the complaint. On May 5, 1971, the Habadas' lawyer wrote Royald Globe, informing it of the suit and requesting that it undertake the defense of the Habadas as agreed in the policy. The delay in formally notifying the insurer was attributed by the Habadas to a misunderstanding on their part over whether the policy covered the accident.

On June 8, 1971, Royal Globe responded with an initial refusal to defend the suit pending its own investigation. The insurer then opened a claim file and sent an investigator to Hinsdale. His report on July 1, 1971, noted that the junkyard only comprised part of the Habada land, that much fill had been dumped on other parts of the parcel and that the prevailing winds in the area would have blown the smoke away from, not across, the highway. The report stated that debris and rubbish had been placed among the trees on a section of heavily wooded land adjacent to the junkyard though not a part of it and that the fire in question was fueled by these materials. On July 13, 1971, Royal Globe formally refused to defend its insured, citing a business use of the property and late notice of the claim.

A series of repeated tenders and refusals followed:

—July 27, 1971: Mrs. Habada tendered the defense, stating that the land had been vacant, not involved in a business, and that notice had been sent as soon as the named insured was brought into the suit as part of discovery.
—September 14, 1971: Royal Globe announced a reappraisal of its position in light of the new question of coverage.

—October 18, 1971: Royal Globe refused the defense, stating that the land could not be construed as vacant because of the junkyard, and that service on Mr. Habada constituted service on the named insured requiring immediate notice.

—November 1, 1971: Mrs. Habada again tendered the defense, and informed the insurer of an offer from the La Rotunda plaintiffs to settle for $5000, an offer explicitly not predicated on the probability of no insurance coverage.

—November 4, 1971: Royal Globe again refused coverage, saying that if the Habadas felt they had a valid case against the insurer, they "had an obvious recourse at law" before trial.

On November 29, 1971, the La Rotunda plaintiffs filed an amended complaint joining Irla Habada as a defendant as the beneficial owner, on the date of the accident, of the 22.5 acres. She filed an answer along with her husband which denied that he had operated a junkyard, but which admitted the landfill operations on the rest of the property. Subsequently, the Habadas' daughter and the land trustee, as well as the driver of the car which struck the La Rotunda vehicle, were dismissed from the suit. On March 9, 1972, a second amended complaint was filed, alleging this time that the fire was on a section of the property that was vacant. The court permitted the Habadas' answer to the first amended complaint to stand as their answer to the second amended complant.

On March 9, 1972, defense was again tendered to the insurer. The La Rotunda plaintiffs made an offer directly to Royal Globe to settle for $98,000. Royal Globe again reconsidered its position, but reaffirmed its denial of coverage. Once again, a business use of the property and prejudicial late notice were given as reasons.

The case went to trial on May 30, 1972. The Habadas were represented only by their own attorney. The jury found for the La Rotunda plaintiffs and awarded them a total of $420,000. On September 5, 1972, the Habadas and the La Rotunda plaintiffs agreed that the case would not be appealed, that the judgment would not be executed against the Habadas personally and that the La Rotunda plaintiffs would step into the place of the Habadas in their action against Royal Globe for failing to defend the suit. After notice of the jury award was given to the insurer, the present suit was filed.

The plantiffs argue in count I that Royal Globe is liable up to the $25,000 policy limit for its failure to defend the suit against its insured as contracted. In count II, they seek $420,000 alleging that Royal Globe's refusal to negotiate or accept the offers of settlement on behalf of its insured was negligent, fraudulent or in bad faith. After depositions were taken and affidavits were filed, both parties moved for summary judgment. The circuit court ruled that no genuine issues of material fact

remained, and granted Royal Globe's motion. This appeal by the La Rotunda plaintiffs followed.

## COUNT I

In its policy, Royal Globe agreed to pay all sums which the insured would become legally obligated to pay as damages as a result of bodily injury or property damage, up to the policy limit. It was given the right to settle the claims against the insured. The policy also stated that Royal Globe:

> "* * * shall defend any suit against the insured alleging such bodily injury or property damage and seeking damages which are payable under the terms of this policy even if any of the allegations of the suit are groundless, false, or fraudulent * * *."

This provision is common in liability insurance policies; it has frequently been the subject of judicial interpretation. An insurer which contracts to defend its insured must defend any action brought against the insured if the complaint sets forth allegations that bring the claim within or potentially within the risks covered by the policy. (*Maryland Casualty Co. v. Peppers* (1976), 64 Ill. 2d 187, 193, 355 N.E.2d 24, 28; *Associated Indemnity Co. v. Insurance Co. of North America* (1979), 68 Ill. App. 3d 807, 815, 386 N.E.2d 529, 536; *McFadyen v. North River Insurance Co.* (1965), 62 Ill. App. 2d 164, 169, 209 N.E.2d 833, 836; *Sims v. Illinois National Casualty Co.* (1963), 43 Ill. App. 2d 184, 193, 193 N.E.2d 123, 127.) The threshold that the complaint must satisfy to present a claim of potential coverage is low. Where there is doubt as to coverage, it is to be resolved in favor of the insured. (*McFadyen*, at 169.) The complaint must be liberally construed and the insurer is required to defend any claim under the pleadings which might possibly fall within the scope of the policy coverage. (*Reis v. Aetna Casualty & Surety Co.* (1978), 69 Ill. App. 3d 777, 784, 387 N.E.2d 700, 706; *Country Mutual Insurance Co. v. Murray* (1968), 97 Ill. App. 2d 61, 72, 239 N.E.2d 498, 504.) That the allegations are groundless, false or fraudulent is of no moment. (*Thornton v. Paul* (1978), 74 Ill. 2d 132, 144, 384 N.E.2d 335, 339.) The insurer can safely and justifiably refuse to defend only when the allegations *clearly* show on their face that the claim is beyond policy coverage (*Associated Indemnity*, at 817; *Sherman v. Home Insurance Co.* (1975), 25 Ill. App. 3d 519, 522, 323 N.E.2d 550, 552), for the duty to defend is broader than the duty to pay (*McFadyen*, at 170).

If the insurer is faced with a complaint which it believes is not covered by the policy, it may defend the suit under a reservation of rights or seek a declaratory judgment that there is no coverage. (*Sims*, at 199.) In its policy the insurer has not only agreed to accept the risk of an

occurrence but also to provide legal services to its insured in any legal action which reasonably could touch upon the policy. If the insurer refuses to defend, it is estopped from later alleging that the insured was not covered under the policy or that there were policy defenses. (*Elas v. State Farm Mutual Automobile Insurance Co.* (1976), 39 Ill. App. 3d 944, 947, 352 N.E.2d 60, 62.) But, there is no estoppel where the insurer was given no opportunity to defend, where there was no policy in existence or where, when the policy and the complaint are compared, there is clearly no coverage. *McFadyen*, at 171.

Neither of the first two exceptions is applicable here. There was a policy in existence, and Royal Globe was repeatedly asked to assume the defense before trial. The sole question is whether the complaint presented a potential coverage. In this regard, a comparison of the complaint and the policy does not demonstrate that there is clearly no coverage.

■■ It was the first La Rotunda complaint that was on file when the defense was initially tendered to Royal Globe. The complaint alleged that Mr. Habada operated a refuse dump on part of the land, although there was no allegation that this dump was run as a business. It also alleged that he negligently burned materials which produced smoke obscuring vision on Route 83, and causing the accident. The policy insured all relatives of Irla Habada as unnamed insureds. It extended to the premises described as well as to the vacant lands of any insured, and it had a business exclusion. The complaint left open the possibilities that the refuse dump was not a business or that the smoke came from a fire on part of the vacant premises that was not devoted to a business use. Thus, it was not clear on the face of the complaint that there was no coverage. Royal Globe was not justified, therefore, in refusing its duty to defend.

■ The results of Royal Globe's own investigation may also be considered as unpleaded facts known to the insurer which indicate that the claim was potentially within the policy's coverage. "To hold otherwise would allow the insurer to construct a formal fortress of the third party's pleadings and to retreat behind its walls, thereby successfully ignoring true but unpleaded facts within its knowledge that require it, under the insurance policy, to conduct the putative insured's defense." (*Associated Indemnity*, at 816-17.) Royal Globe's investigation disclosed that part of the land in question was in fact vacant, and that the smoke which caused the accident might have come from that part of the land. Royal Globe thus knew when it refused to defend the second amended complaint that despite the business exclusion in the policy, there was a possibility that the exclusion did not apply. There was potential coverage, and the insurer should have taken up the defense.

■■ Royal Globe argues that reasonable notice was not given, and that notice was a condition precedent to the policy's duty to defend. The

reasonable belief of the insured that there was no liability because there was no causation might have been enough to justify the late notice (see *Farmers Automobile Insurance Associaton v. Hamilton* (1975), 31 Ill. App. 3d 730, 733, 335 N.E.2d 178, *aff'd* (1976), 64 Ill. 2d 138, 355 N.E.2d 1), or the conversations between the insured and her insurance agent about the La Rotunda suit might have been substantial notice sufficient to comply with the policy. Regardless, reasonable notice is a matter of fact to be determined by the trier of fact. As the court stated in *Higgins v. Midland Casualty Co.* (1917), 281 Ill. 431, 440, 118 N.E. 11, 14, a case involving the reasonableness of notice to an insurer, "* * * it was a question for the jury as to whether or not the notice was given within a reasonable time, taking into consideration all the facts and circumstances shown by the evidence * * *." (See also *Rivota v. Kaplan* (1977), 49 Ill. App. 3d 910, 920, 364 N.E.2d 337, 346; *Kenworthy v. Bituminous Casualty Corp.* (1975), 28 Ill. App. 3d 546, 549, 328 N.E.2d 588, 590; *H. H. Hall Constructon Co. v. Employers Mutual Liability Insurance Co.* (1963), 43 Ill. App. 2d 62, 68, 193 N.E.2d 51, 54). If the insurer thought that it had received notice too late to trigger its obligations, it should have litigated that fact in a declaratory judgment action or defended under a reservation of rights as the insurer did in *INA Insurance Co. v. City of Chicago* (1978), 62 Ill. App. 3d 80, 379 N.E.2d 34. The insurer, in its own words to Habada, "had an obvious recourse at law" if it felt that it had a valid case of non-coverage. In *Reis*, the court stated the Illinois rule on which we rely in shaping our conclusions as follows:

> "In Illinois, a liability insurer in doubt over whether it has a duty to defend its insured, cannot simply stand on the sidelines and wait until the tort action is completed before contesting the question of coverage. * * * [W]here there is potential coverage * * * it must either (1) secure a declaratory judgment as to its rights and obligations before or pending trial of the original tort action or (2) defend the tort action under a reservation of rights. [Citations.] Where a duty to defend exists, but the insurer fails to take either course of action, its failure to defend is unjustified, and in a subsequent action by the insured against it, it is barred from disputing the questions of coverage." (69 Ill. App. 3d 777, 782-83.)

Thus, Royal Globe was estopped from denying its policy coverage.

Royal Globe's position is not supported by *Thornton v. Paul* (1978), 74 Ill. 2d 132, 384 N.E.2d 335. That case allows the insurer to escape estoppel where a prior adjudication established, at least in a *prima facie* manner, that there was no potential coverage, or where the insurer and insured had conflicting interests in conducting the defense. Neither situation applies here.

Royal Globe was liable for the costs of the defense of the La Rotunda

suit (*Thornton*, at 145), as well as for the maximum amount of the policy coverage: $25,000 (*Reis*, at 789; *Associated Indemnity*, at 822). Summary judgment was erroneously granted to the defendant; that judgment is reversed, and judgment is hereby entered in favor of the plaintiffs on count I.

## Count II

Count II seeks damages of $420,000—the full judgment against the insured, and substantially more than the policy limits—for the insurer's negligent, fraudulent or bad faith refusal to settle the tort case on behalf of Habada.

*Reis* implicitly held, and we agree, that the estoppel to deny coverage operates above the policy limits as well as below, for grievances based on failure to settle as well as for the usual claim for indemnity on the policy. We must continue to presume, therefore, as we concluded in considering count I, that the tort suit was within the coverage of the policy.

An insurer's duty is not always satisfied by merely paying off whatever the final judgment turns out to be, up to the policy limit, leaving the insured to scrape up the excess. It may not cavalierly gamble with its insured's money. It must exercise care and skill to insulate the insured from liability; its conduct must be free of bad faith, fraud or negligence. ■■■ If an opportunity appears to settle within the policy limits, thereby protecting the insured from excess liability, the insurer must faithfully consider it, giving the insured's interests at least as much respect as its own. (*General Casualty Co. v. Whipple* (7th Cir. 1964), 328 F.2d 353, 356.) The insurer need not submit to extortion; it may reject a bad deal without waiving the protection the policy limit gives it against the vagaries of lawsuits. But if the honest and prudent course is to settle, the insurer must follow that route. If it deviates from that course, it will be liable for the whole judgment, so as to give the insured the protection that the policy was intended to provide. In cases within the policy limits, the insured was to be held entirely harmless. If the insurer by its own fault converts such a case—one the insurer could have disposed of for a fair sum within the policy limits—into a case beyond the policy limits, the insurer cannot complain of the size of the judgment, a consequence of its own bad faith, fraud or negligence.

This rule is well established in the usual case where the insurer is in control of the defense. An unwillingness to settle coming in the context of a complete refusal to get involved, as was Royal Globe's response, is more complicated. Different courts treat the situation differently; for a sample of the possibilities see *Luke v. American Family Mutual Insurance Co.*

(8th Cir. 1972), 476 F.2d 1015. But the rule which we believe to be the best and which also happens to be the developing Illinois rule, is that a wrongful refusal to defend does not alter the legal standard by which the insurer's failure to settle is judged. The insurer cannot absolve itself of its obligation to consider settlement offers in good faith by simply breaching its duty to defend. This view was stated in *Reis*, when the court said:

> "The mere failure to defend does not, in the absence of bad faith, render the insurer liable * * * in excess of the policy limits. [Citations.] Nevertheless, damages for a breach of the duty to defend are not inexorably imprisoned within the policy limits, but are measured by the consequences proximately caused by the breach. * * * [If the insurer] in bad faith refused to defend [citation], *or in bad faith or negligently failed to settle the claim*, or because it abandoned her defense, the excess judgment was entered, [the insured] may recover the total amount of the judgment * * *." (Emphasis added.) 69 Ill. App. 3d 777, 790.

It is true that an insurer who denies coverage completely is less subject to certain temptations to disloyalty than the insurer who recognizes coverage. But variations in the likelihood of particular kinds of disloyalty cannot affect the general principle demanding good faith. They are only circumstances for the trier of fact to consider in determining whether the insurer did act improperly.

It is also true that the insured here was not entirely at the insurer's mercy. By denying coverage, Royal Globe waived its right to control the litigation. The insured was free to make her own settlement. Habada, therefore, had some duty to act reasonably and in good faith, to make the best of the situation. To the extent the verdict was her fault rather than the insurer's, she ought not to recover. We emphasize, however, that an insured is not generally on equal footing with its insurer. The insured usually has neither the skill nor the liquidity of the insurer. When an insurance company refuses to defend, it thrusts responsibility for resolution of the tort claim back onto its insured, who bargained and paid for the peace of mind that comes from relying on an insurance company to defend and cover the claim. Now the insured, as a result of the insurer's refusal, must make uncontemplated decisions. Habada put her trust in Royal Globe; Royal Globe accepted that position and cannot at will repudiate it. In such cases the insured cannot be held to the same standard of conduct as a professional insurance company. The mere fact that the insured refused the same settlement offer as the insurer, or that she put up a less vigorous and effective defense than the insurer might have, does not necessarily discharge the insurer from the consequences of its own misconduct.

The negligence, bad faith and fraud which count II attributes to Royal Globe's refusal to settle raise questions of fact to be resolved by a trier of fact. (*Browning v. Heritage Insurance Co.* (1975), 33 Ill. App. 3d 943, 946, 338 N.E.2d 912, 915.) The evidence here is inconclusive and subject to various interpretations. Royal Globe has not demonstrated that it is entitled to judgment as a matter of law, and the summary judgment in its favor must be vacated and the case remanded for trial.

■■ Citing *Elas v. State Farm Mutual Automobile Insurance Co.* (1976), 39 Ill. App. 3d 944, 352 N.E.2d 60, Royal Globe contends that the plaintiffs may not recover in excess of the policy limits because the La Rotunda-Habada agreement insulated the insured from any actual damages. In *Elas*, the holding of a divided court restricted recovery to the policy limits, but the holding was specifically limited to situations where a pretrial settlement was reached in the underlying suit and where the settlement was in reliance upon a specific amount of coverage from an insurer which refused to defend. (39 Ill. App. 3d 944, 949.) Here, the agreement, which transferred the Habada cause of action against Royal Globe in return for a promise not to collect personally from the Habadas, was not part of a settlement but came months after the jury verdict against the Habadas for $420,000. So far as the record on which the summary judgment was based shows, the verdict was apparently contested, was not the result of collusion and is unlike the "friendly" pretrial settlement in *Elas*. There is no reason to limit the insurer's liability, or to preclude the plaintiffs from recovering in excess of the policy limit if they prove the insurer was at fault in rejecting the settlement offer.

### Discovery of Insurer's Interoffice Communications

■■ Plaintiffs requested discovery of 19 memoranda exchanged between various employees of Royal Globe and moved to compel the production of these documents. Royal Globe asserts that the denial of this motion was proper because the documents were communications prepared by and communicated to decision-making, control group members of the company. But such documents are not privileged unless the control group is communicating with its attorney. (*Day v. Illinois Power Co.* (1964), 50 Ill. App. 2d 52, 199 N.E.2d 802.) This issue was not preserved for appeal as well as it might have been; nevertheless, absent an attorney-client privilege the documents should have been produced. If the plaintiffs still desire these documents for the trial of the issues raised by count II, they should be produced.

The summary judgment in favor of the defendant on count I is reversed and the judgment is hereby entered in favor of plaintiffs on that count. The summary judgment in favor of defendants on count II is

reversed and that count is remanded for further proceedings. The circuit court's order regarding production of documents shall be consistent with this opinion.

Judgment reversed and remanded with directions.

McNAMARA and RIZZI, JJ., concur.