CATERPILLAR, INC., Plaintiff–
Appellee, Cross–Appellant,

v.

GREAT AMERICAN INSURANCE
COMPANY, Defendant–Appellant,
Cross–Appellee.

Nos. 94–3707, 94–3708.

United States Court of Appeals,
Seventh Circuit.

Argued April 3, 1995.

Decided Aug. 10, 1995.

Rehearing and Suggestion for
Rehearing En Banc Denied
Sept. 15, 1995.

William R. Jentes (argued), Chaim T. Kiffel, Kirkland & Ellis, Chicago, IL, Theodore R. Johnson, Caterpillar, Inc., Peoria, IL, for plaintiff-appellant.

Michael P. Comiskey (argued), Lyle W. Sparks, William P. Bila, Lord, Bissell & Brook, Chicago, IL, for defendant-appellee.

Gary V. Dixon, Merril Jay Hirsh, David M. Gische, Wallace A. Christensen, Ross, Dixon & Masback, Washington, DC, Robert M. Pozin, Ross, Dixon & Masback, Irvine, CA, for amici curiae.

Before RONEY,* FLAUM, and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

Caterpillar, Inc. and Great American Insurance Company both appeal from a decision of the district court granting in part and denying in part Caterpillar's motion for summary judgment regarding the coverage afforded Caterpillar's directors and officers under a directors' and officers' liability insurance policy with respect to claims made against them in a federal class action securities suit. The district court determined that Caterpillar had not breached any conditions precedent in the policy in settling the suit but that Great American was entitled to attempt to allocate a portion of the settlement to uncovered claims or parties. We now affirm that decision but do so with modifications.

## I.

This insurance dispute derives from the Brazilian economic crises of the Spring of 1990. These crises substantially injured the Brazilian operations of Caterpillar, Inc., which in turn substantially reduced Caterpillar's profits. The disclosure of that decline in profits caused Caterpillar stock to lose 20% of its value over two days in June, 1990. That price drop subsequently inspired Cater-

* The Honorable Paul H. Roney of the United States Court of Appeals for the Eleventh Circuit is sitting by designation.

pillar shareholders to sue Caterpillar and five of its directors. *See Kas v. Caterpillar, Inc., et al.,* No. 90–1238, and *Margolis v. Caterpillar, Inc., et al.,* No. 90–1242 (later consolidated as a class action as the *Kas* litigation).

The *Kas* complaint alleged several federal securities law (Sections 10(b) and 20 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t and Rule 10b–5, 17 C.F.R. § 240.10b–5) and state law violations based on the defendants' failure to disclose the significance of Caterpillar's Brazilian operations, as well as the costs of a January, 1990 reorganization. Specifically, the *Kas* plaintiffs asserted that Caterpillar and its officers had indicated that the Brazilian plants accounted for only 5% of overall sales but had neglected to mention that these same plants generated 20% of Caterpillar's profits in 1989 and 30% in the first quarter of 1990. Thus, the plaintiffs argued, investors could not fully appreciate the potential impact of Brazil's economic woes on Caterpillar's bottom line.

At the time the *Kas* case was filed, Caterpillar held a directors' and officers' liability ("D & O") insurance policy purchased from Great American Insurance Company.[1] The policy in the present case requires Great American to reimburse Caterpillar's directors and officers (or Caterpillar itself if it had already indemnified the directors and officers) under certain circumstances:

I.A. With the Directors or Officers of the Company that if, during the Policy Period or the Discovery Period, any Claim is first made against the Directors or Officers, individually or collectively, for a Wrongful Act the Insurer will pay on behalf of the Directors or Officers all Loss which the Directors or Officers shall be legally obligated to pay, except for such Loss which the Company actually pays as indemnification.

I.B. With the Company that if, during the Policy Period or the Discovery Period, any Claim is first made against the Directors or Officers, individually or collec-

tively, for a Wrongful Act the Insurer will reimburse the Company for all Loss which the Company has to the extent permitted by law indemnified the Directors or Officers.

The policy also provides for payment of defense costs as well as indemnification above a $10 million retention but does not impose on Great American a duty to defend Caterpillar or its directors or officers against any claims.

The policy further includes a number of duties on the part of Caterpillar, of which two are relevant:

VI.A. The Directors or Officers shall not admit liability for, or settle, any Claim or incur Costs of Defense in connection with any Claim, without the Insurer's prior written consent, which consent shall not be unreasonably withheld. The Insurer shall be entitled to full information and all particulars it may request in order to reach a decision as to such consent. Any Costs of Defense incurred, and/or settlements agreed to prior to the Insurer consent thereto shall not be covered.

VI.C. The Insurer shall at all times have the right, but not the duty, to associate with the Directors or Officers in the investigation, defense or settlement of any Claim, to which this Policy may apply.

Another provision made Caterpillar's "full compliance ... with all of the terms of this Policy" a condition precedent to any indemnification action against Great American.

On July 25, 1990, less than a week after the two *Kas* complaints were filed, Caterpillar informed Great American of the suits. Great American's counsel acknowledged the litigation and in an October 12, 1990 letter notified Caterpillar in regard to the pending litigation:

In order that we may proceed with our investigation of the facts and circumstances which have given rise to the class actions, we ask that you and counsel furnish us with copies of reports, investigations, pleadings, dispositive motions, briefs,

---

1. D & O policies, which first became popular in the 1960s, protect directors and officers from the potential liability they might incur in performing their duties, thereby encouraging better directors and officers to accept responsibilities and allowing them to take management risks they might not otherwise take. *See* Roberta Romano, *What Went Wrong With Directors' and Officers' Liability Insurance?*, 14 Del.J.Corp.L. 1, 3–5 (1989).

court orders and other pertinent documents on a current basis, and provide us with periodic reports on the status of the litigation, as provided in Section VII.C. We would also like copies of defense counsel's invoices as they are generated.

Both before and after this letter, Caterpillar, through its in-house and outside counsel, promised to keep Great American "informed of developments as they occur." Letters from Caterpillar and its lawyers indicate that they provided Great American with notice of numerous motions and memoranda filed with the court and of accumulating defense costs. An October 10, 1991 letter sent to another of Caterpillar's insurers but copied to Great American stated that:

> [t]he possibility of settlement prior to finalization of the plaintiffs' complaint is being explored. No definitive offer has been made to, or received from, the plaintiffs. Whether or not an acceptable settlement can be reached will depend on a variety of factors, including the cooperation of Caterpillar's insurers. Needless to say we will keep you advised of developments in this area.

On March 30, 1992, the district court denied Caterpillar's motion to dismiss the *Kas* complaint for failure to allege scienter adequately. *Kas v. Caterpillar, Inc., et al.*, 815 F.Supp. 1158, 1165 (C.D.Ill.1992). The next day, pursuant to a settlement between it and Caterpillar, the SEC issued an order concluding that Caterpillar had failed to comply with Section 13(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(a), as well as with certain rules promulgated thereunder.

During this same time period, Caterpillar, through its initial outside counsel, Orrick,

Herrington & Sutcliffe, had discussed a settlement with the *Kas* plaintiffs that called for a cash payment of $5 million and stock warrants with a minimum value of $15 million and a maximum of $45 million.[2] Orrick, Herrington apparently mentioned the offer for the first time in November or December, 1991 and renewed it with reservations in a May 27, 1992 letter.[3] The offer apparently was made again on March 18, 1993, by Kirkland & Ellis, which by then had replaced Orrick, Herrington.[4]

Great American claims it received no notice of these negotiations until the Spring of 1993. A May 4, 1993 letter from Great American's attorneys to Caterpillar's in-house counsel reflected surprise and dismay that Caterpillar had made any previous settlement offers and professed a lack of prior knowledge of those negotiations. In that same letter, which foresaw many of the arguments Great American raises in the current litigation, Great American complained that Caterpillar was making offers well above what it should have and that these offers unreasonably raised the plaintiffs' expectations of settlement. The letter continued:

> We recognize that your decision to proceed without Great American's input was probably based on your conclusion that after allocating the settlement between the liability of the Company (uninsured) and the individual defendants, and applying the $10 million retention to the covered portion, Caterpillar would not be seeking reimbursement from Great American. However, given the magnitude of the plaintiffs' demands, we feel that all settlement proposals should be presented first to Great American, whether or not they are anticipated to involve the coverage.

**2.** The warrants, which were to number 3 million, were valued at a minimum of $5 each plus an additional dollar for every dollar Caterpillar's stock price exceeded $60 on the warrant's expiration date. The added value was capped at $70, so that each warrant would never be worth more than $15.

**3.** The letter hinted that Caterpillar might be more reluctant about the offer as of May 27, 1992, because the stock price was then around $59–5/8, much higher than its value in November and December of 1991. *See, e.g., Caterpillar Says Q4 Loss to Exceed 86 Million Dollars,* AFP–Extel

News (November 14, 1991) (reporting Caterpillar's closing price at $48); Penny Britell, *U.S. Stocks Close Firm After Turbulent Session,* Reuters Newswire (December 11, 1991) (reporting Caterpillar's closing price at $39). Caterpillar disputes whether it ever authorized this renewed offer.

**4.** At this point, according to correspondence from the plaintiffs, Caterpillar's stock price had dropped to $58. The plaintiffs' attorneys rejected the offer, proposing instead that the case be settled for $115 million.

Great American also responded to the news by engaging a settlement consultant, who issued a report on June 2, 1993, predicting that the *Kas* litigation should settle for approximately $10.6 million. Caterpillar's next settlement offer, made at a June 29, 1993 meeting, dropped to $4.5. After further negotiations, the parties agreed to a settlement worth between $17.25 and $23 million. Great American approved the settlement subject to certain reservations, and the district court entered the settlement on February 14, 1994.

Prior to the finalization of the settlement, Caterpillar filed the instant suit against Great American seeking a declaration that Great American was liable for the entire settlement amount and defense expenses in excess of the policy's $10 million retention. Before discovery had begun, Caterpillar moved for summary judgment on the declaratory judgment count without requesting a ruling on damages. Great American responded that it had no obligation to indemnify because Caterpillar had violated conditions precedent in the insurance contract by failing to inform it of the settlement negotiations prior to mid–1993. Alternatively, Great American argued, even if the policy did apply, it was entitled to an allocation for the portion of the settlement not attributable to the actions of Caterpillar's directors and officers.

The district court granted in part and denied in part Caterpillar's motion for summary judgment. *Caterpillar, Inc. v. Great American Ins. Co.*, 864 F.Supp. 849 (C.D.Ill. 1994). The court found that Caterpillar had not violated the terms of the insurance agreement and that the policy applied to the settlement and granted summary judgment to Caterpillar on that issue. The court also determined, however, that Great American was entitled to an allocation of some sort. Relying on our decision in *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357 (7th Cir.1990), the district court concluded that Great American could try "to prove that all or part of those activities attributed to C[aterpillar] and its board in the *Kas* complaint were performed by uninsured persons or persons against whom no claims were made." *Caterpillar*, 864 F.Supp. at 854. The district court, again looking to *Harbor*,

also indicated that in any allocation, Great American would not be permitted to exclude Caterpillar's potential liability. The *Harbor* court had stated that any corporate securities liability in that case would be entirely dependent on the activities of the directors and officers, thereby rendering those persons ultimately responsible for any liability the corporation faced. Notwithstanding the fact that *Harbor*'s comments on this issue were dicta, the district court thought that *Harbor* was "the best indication of how the Seventh Circuit would decide the issue" and that it would lead to the same result here. *Id.* at 857. Thus, while the district court refused to grant summary judgment on the issue, it markedly limited the scope of allocation.

Although the district court's ruling did not constitute a final order, the court certified its order for interlocutory appeal under 28 U.S.C. § 1292(b). Both parties filed timely petitions to this Court for leave to appeal, and we granted those petitions.

## II.

■ Great American and Caterpillar each appeal the district court's decision regarding allocation of liability under the policy. The district court held that Great American was entitled to an allocation, but only to the extent that the settlement was larger because of the activities of employees other than those directors and officers against whom claims were made. Great American asserts that allocation should be broader and should reflect Caterpillar's direct corporate liability. Caterpillar, in its cross-appeal, maintains that the district court, if anything, went too far and that no allocation for the acts of unnamed persons should be allowed. Both appeals are based on the district court's denial of summary judgment, a decision we review *de novo*. *United States v. Wisconsin Power and Light Co.*, 38 F.3d 329, 332 (7th Cir.1994). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P.

56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). We view the record in the light most favorable to the non-moving party, noting that a genuine issue of material fact exists only where the potential evidence would permit a reasonable finder of fact to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986).

### A.

We have addressed the allocation issue only once before, albeit as dicta. *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357 (7th Cir.1990). In *Harbor*, a number of Continental Bank investors had filed securities fraud suits against Continental in the wake of its collapse following the Penn Square bank debacle. In two suits, investors claimed that Continental had concealed the nature of its Penn Square loans in order to inflate its stock price. The first suit, a class action, named as defendants Continental as well as twenty-five directors, officers, and employees of Continental, identified in the complaint only as "John Does." The second suit named Continental and five specific directors. Continental settled the cases for $17.5 million and then turned to its insurers, Allstate and Harbor, who refused to pay under D & O policies they had issued. *Id.* at 359–60.

*Harbor's* holding primarily concerned the proper application of Illinois's "mend the hold" doctrine: prior to the settlement, Allstate and Harbor had argued that the directors' conduct had been so egregious that it placed them beyond coverage; after the settlement, the insurers reversed their position and contended that Continental had improperly paid out any money because the directors had done nothing wrong. Our ruling on that issue required remanding the case for a new trial, and in order to guide that proceeding, we discussed how damages should be calculated and liability allocated. We noted that "[t]o the extent that the amount for which Continental settled was larger than it would have been but for the misfeasance of these other persons—either

noninsured persons or persons against whom no claim was made—Continental's entitlement to reimbursement in this suit would be cut down." *Id.* at 367. *Harbor* thus counseled an allocation of a settlement only where that settlement is larger because of the activities of uninsured persons who were sued or persons who were not sued but whose actions may have contributed to the suit, an approach other courts have referred to as the "larger settlement" rule. *See Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1432–33 (9th Cir.1995); *Raychem Corp. v. Federal Ins. Co.*, 853 F.Supp. 1170, 1180–82 (N.D.Cal.1994).

Great American, as well as Amici Aetna Casualty and Surety Company, et al., argue that we should reject the larger settlement rule. They view the rule as an unfair rationing that allows uninsured defendants, usually the corporation, to piggy-back on D & O policies designed to insure only directors and officers. Even though the directors and officers might be theoretically liable for most if not all of what is commonly alleged in securities suits, they assert that it is unrealistic to assume that these suits and settlements could ever hinge on that liability alone. They also note that settlements provide a number of benefits to a corporate defendant and assert that directors and officers (and therefore their insurers) should not have to subsidize those benefits. Instead, they maintain, we should follow a "relative exposure" rule, a rule derived from the first reported D & O allocation case, *PepsiCo, Inc. v. Continental Cas. Co.*, 640 F.Supp. 656 (S.D.N.Y. 1986). In *PepsiCo*, PepsiCo had settled a number of claims stemming from a class action suit that had named as defendants PepsiCo, its directors and officers, a former officer, and its accounting firm. PepsiCo then sought complete indemnification for the suit under its D & O policy, which provided that "Loss shall mean any amount which the Directors and Officers are legally obligated to pay for ... a claim or claims made against them for Wrongful Acts." *Id.* at 659. Interpreting the policy under New York law, the court held that it "require[d] the parties to allocate the settlement costs between those amounts attributable to the directors and officers and those attributable to PepsiCo

and its accountants." *Id.* at 662. Thus, responsibility for the settlement bill should be allocated "according to the relative exposures of the respective parties to the [suit]." *Id.* A subsequent case, *Safeway Stores, Inc. v. National Union Fire Ins. Co.,* 1993 WL 739643 (N.D.Cal. Feb. 4, 1993), in which both parties agreed "that the proper method of allocation is to determine the relative exposure of ... officers and directors vis a vis uninsured defendants in the underlying shareholder actions," *id.* at *5, provided an extensive list of what should be considered in allocation:

(1) the identity, as an individual, an entity, or as a member of a group, of each beneficiary and the likelihood of an adverse judgment against each in the underlying action;

(2) the risks and hazards to which each beneficiary of the settlement was exposed;

(3) the ability of each beneficiary to respond to an adverse judgment;

(4) the burden of litigation on each beneficiary;

(5) the 'deep pocket' factor and its potential effect on the liability of each beneficiary;

(6) the funding of the defense activity in the litigation and the burden of such funding;

(7) the motivations and intentions of those who negotiated the settlement, as shown by their statements, the settlement documents and any other relevant evidence;

(8) the benefits sought to be accomplished and accomplished by the settlement as to each beneficiary, as shown by the statements of the negotiators, the settlement documents and any other relevant evidence;

(9) the source of the funds that paid the settlement sum;

(10) the extent to which any individual defendants are exempted from liability by state statutes or corporate charter provisions; and

(11) such other and similar matters ·as are peculiar to the particular litigation and settlement.

*Id.* at *5–6 (citing William E. Knepper & Dan A. Bailey, LIABILITY OF CORPORATE OFFICERS AND DIRECTORS § 17.06, Supp. at 248–49 (Michie, 4th ed.1988 & Supp.1992)). The relative exposure rule thus envisions a somewhat elaborate inquiry into what happened in a settlement and who really paid for what relief. *See also First Fidelity Bancorporation v. National Union Fire Ins. Co. of Pittsburgh,* 1994 WL 111363 (E.D.Pa. March 30, 1994); *Nodaway Valley Bank v. Continental Cas. Co.,* 715 F.Supp. 1458, 1465–67 (W.D.Mo.1989), *aff'd* 916 F.2d 1362 (8th Cir. 1990);[5] *Perini Corp. v. National Union Fire Ins. Co.,* 1988 WL 192453 (D.Mass. June 2, 1988).

■ In selecting one rule over the other, our role is to interpret the insurance contract between Caterpillar and Great American based on the applicable contract law, in this case that of Illinois. We do not sit to develop general canons of allocation for every conflict between D & O insurers and their insureds; rather we read a particular insurance contract and decide what method of allocation, if any, that contract envisions. *See Nordstrom,* 54 F.3d at 1432.

We first note, as the district court indicated, that the insurance contract does not contain an allocation clause. However, the contract only requires Great American to indemnify Caterpillar to the extent Caterpillar paid to resolve claims actually made against its directors and officers. It does not obligate the insurer to do more. As such, assuming the possibility that the settlement did more than resolve these claims, some measure of allocation is appropriate.

■ Determining of how much allocation is appropriate depends on what the insured did in settling the complaint. *Raychem,* 853 F.Supp. at 1183; *cf. Hudson Ins. Co. v. City of Chicago Heights,* 48 F.3d 234, 238 (7th

---

**5.** There is some dispute as to which camp *Nodaway* belongs. Knepper and Bailey argue that Nodaway is a relative exposure case, *see* 2 Knepper and Bailey, *supra,* § 21–7 at 50 (5th ed. 1994 Supp.), while *Nordstrom, Inc. v. Chubb & Son, Inc.,* 820 F.Supp. 530, 533 (W.D.Wash.1992),

*aff'd,* 54 F.3d 1424 (9th Cir.1995), places it in a league with *Harbor* on this issue. The confusion is understandable, given *Harbor*'s favorable citation of *Nodaway* on a related issue, *see Harbor,* 922 F.2d at 368, but we believe *Nodaway* is more properly categorized as a relative exposure case.

Cir.1995). Caterpillar paid money and offered warrants in exchange for dismissal with prejudice of all claims against the defendants named in the *Kas* complaint, as well as against a list of other Caterpillar affiliates, or any potential claims related to those made in the *Kas* complaint. The Great American policy provided coverage for "all Loss which the Directors or Officers shall be legally obligated to pay" where "any Claim is first made against the Directors or Officers, individually or collectively, for a Wrongful Act." That language implies a complete indemnity for claims regardless of who else might be at fault for similar actions. *Cf. Chicago Bd. of Options Exch., Inc. v. Harbor Ins. Co.*, 738 F.Supp. 1184, 1186 (N.D.Ill.1990) ("The court is obliged to hold Harbor to the terms of its policy: any claim against an officer or director for a wrongful act, for which CBOE had to indemnify that officer or director, triggers Harbor's obligation to reimburse CBOE.").

Thus, in the instant case, we believe the larger settlement rule better suits the facts: the policy does not limit coverage because of the activities of others that might overlap the claims against the directors and officers. Furthermore, we note that Illinois disfavors *pro rata* allocation absent language in the insurance contract that so requires. *See Zurich Ins. Co. v. Raymark Industries*, 118 Ill.2d 23, 112 Ill.Dec. 684, 699, 514 N.E.2d 150, 165 (1987). We also believe that a protracted pursuit of the motivations underlying a settlement, as suggested in *Safeway* and by Great American and the amici, is not necessarily the best way to resolve coverage disputes: The question at issue is whether the insurance policy covered certain claims, not the metaphysical underpinnings of why a corporation or its directors and officers might have acted as they did. *See Nordstrom*, 54 F.3d at 1433 n. 2.[6]

**6.** Our decision does not leave Great American "without recourse" against uninsured persons who participated in the alleged wrongful conduct but whose actions did not make the settlement larger. *Raychem*, 853 F.Supp. at 1182–83. The insurer, as subrogee of the directors and officers under Section VIII.E of the policy, may still pursue contribution claims against those other persons. *See Musick, Peeler & Garrett v. Employers' Ins. of Wausau*, — U.S. —, —, 113 S.Ct.

**B.**

■ We thus adopt *Harbor*'s dicta regarding the larger settlement rule as our holding today. *Harbor* also indicated, however, that corporate liability caused by the actions of directors should not come into the allocation calculus.[7] Relying on the premise that Continental as a corporate entity only had liability derivative of the directors, *Harbor* stated that any allocation between the directors' liability and corporate derivative liability "would rob Continental of the insurance protection that it sought and bought." *Id.* at 368; *see also Nodaway*, 715 F.Supp. at 1466. In *Harbor*, we assumed that for almost any liability the corporation might have faced, it could have demanded reimbursement from its directors and officers.

Since *Harbor*, the Supreme Court has noted that corporations face direct liability under section 10(b) of the 1934 Act and Rule 10b–5. *Musick, Peeler & Garrett v. Employers' Ins. of Wausau*, — U.S. —, —, 113 S.Ct. 2085, 2090–91, 124 L.Ed.2d 194 (1993); *see also Central Bank of Denver v. First Interstate Bank of Denver*, — U.S. —, —, 114 S.Ct. 1439, 1448, 128 L.Ed.2d 119 (1994). The possibility of direct liability in these cases calls into question *Harbor*'s premises regarding corporate liability. Indeed, there are conceivable situations where the individual actors would not be liable but their corporate employer would be, for example where a case depends on the collective scienter of its employees or where defenses are available to individuals but not the corporation. *See Nordstrom*, 54 F.3d at 1435. If a corporation's liability in the face of a federal securities suit is possibly direct and not merely derivative, then *Harbor*'s conjunction of officers and directors' liability and corporate liability loses some of its force.

2085, 2086, 124 L.Ed.2d 194 (1993); *Nordstrom*, 54 F.3d at 1436.

**7.** The question whether a corporation can incur liability in securities suits independent of the liability its directors and officers would face as individuals is closely related to the relative exposure/larger settlement dispute. The two remain, however, distinct problems.

The fact that a premise is incorrect, however, does not necessarily dictate that conclusions based on the premise are incorrect. The *Kas* complaint may have implicated direct claims against Caterpillar, but regardless of whether corporate liability is legally direct or derivative, a corporation still must act through its agents. If all those agents were directors and officers covered under the Great American policy, and Caterpillar incurred direct liability because of these individuals' actions, then perhaps the D & O policy should still cover claims based on those actions. *See Nordstrom*, 54 F.3d at 1434–36; *Ameriwood Industries Int'l Corp. v. American Cas. Co. of Reading, Pennsylvania*, 1994 WL 396089 at *9 (W.D.Mich.1994), *vacated upon stipulation of parties*, 864 F.Supp. 34 (W.D.Mich.1994). Furthermore, as *Nordstrom* noted, there is little case law supporting an independent corporate scienter theory. 54 F.3d at 1435. *But cf. In re Warner Communications Securities Litigation*, 618 F.Supp. 735, 752–53 (S.D.N.Y.1985) (noting that "the requisite degree of scienter is likely to be easier to attribute to [the corporation] than the individual defendants" and that "such proof would expose [the corporation] to infinitely greater liability than it would the individual defendants"), *aff'd*, 798 F.2d 35 (2d Cir.1986); William M. Fletcher, Fletcher Cyclopedia of Private Corporations § 790 at 16 (perm.ed.). In other words, the differentiation between direct and derivative liability may well be a distinction without a difference.

In this case, we believe the distinction may matter. Caterpillar's policy obligates Great American to indemnify Caterpillar only to the extent Caterpillar must indemnify its directors and officers. Corporate derivative liability, which would essentially be a form of *respondeat superior* for these cases, entitles a corporation to indemnification from its officers and directors for liability those persons bring upon the corporation. *Cf. Steele v. Hartford Fire Ins. Co.*, 788 F.2d 441, 446 (7th Cir.1986). But direct liability, as might have existed here,[8] ordinarily creates no such right of indemnification in the corporation, *see New Zealand Kiwifruit Marketing Board v. City of Wilmington*, 825 F.Supp. 1180, 1191 (D.Del.1993), and section IV.K of the policy in question excludes coverage for "any Claim made against the Directors or Officers ... by or at the behest of the Company." Moreover, we have held that federal securities law contains no implied right of indemnification under section 10(b), *King v. Gibbs*, 876 F.2d 1275, 1282–83 (7th Cir.1989); *see also Eichenholtz v. Brennan*, 52 F.3d 478, 483 (3d Cir.1995), although it allows contribution actions. *Musick, Peeler,* —— U.S. at ——, 113 S.Ct. at 2086. For whatever liability the corporation faced under § 10(b) and Rule 10b–5, it could not then turn to the responsible directors and officers for indemnification. Direct liability under section 10(b) was certainly a possibility in this case; the *Kas* complaint alleged actions by Caterpillar as a whole and named Caterpillar in the complaint, and the settlement contained language resolving any claims against the corporation and persons other than the directors and officers. Direct liability may also have arisen as the consequence of actions of persons other than officers and directors, something at which the SEC opinion and order hinted. Similarly, Caterpillar may well have incurred liability for the actions of its directors for which its directors and officers were themselves immune and could not have suffered any consequences.[9] To the extent the trier of fact determines that Caterpillar disposed of any direct action against it in settling the complaint and that that disposition increased the settlement figure,

8. As Great American notes, the claims in the *Kas* complaint against Caterpillar did not raise the issue of *respondeat superior* liability.

9. *Nordstrom* rejected the possibility of finding corporate scienter without finding that scienter on the part of any particular director or officer: "On this record, we see no way that [the insurer] could show that the corporation, but not any individual defendants, had the requisite intent to defraud. Thus, any direct corporate liability would be derivative of, or concurrent with, D & O liability." 54 F.3d at 1436. *Nordstrom* thus differs from this case in its particulars, not in its analysis; in *Nordstrom*, extensive discovery was already underway (Nordstrom had produced over 100,000 pages of documents), *see id.* at 1429, whereas Caterpillar moved for partial summary judgment before discovery even began.

Caterpillar should not be entitled to recover from Great American.[10]

In its cross-appeal, Caterpillar argues that the district court went too far in permitting an allocation to persons who were never named in the litigation. Caterpillar points out that the complaints in *Harbor* hinted at other, unnamed persons (the twenty-five "John Does") who might have been responsible for increasing the costs of the settlement. In the instant case, Caterpillar argues, that sort of argument is irrelevant because the *Kas* complaint explicitly alleged in paragraph 14 that "[e]ach of the individual defendants is liable as a direct participant in, an aider and abettor of, and co-conspirator with respect to the wrongs committed by all defendants complained of herein." Furthermore, the complaint stated in paragraph 46 that "[t]he name of each person and/or entity who is responsible for, participated in, conspired to bring about, or aided and abetted the fraud complained of herein, is set forth in this Complaint."

■ Contrary to Caterpillar's assertions, we believe the district court correctly interpreted *Harbor* on this point. The *Kas* plaintiffs named Caterpillar in the underlying suit, and some of its liability may well have stemmed from the actions of other persons, as hinted at in both the complaint and the settlement. While an insurer may not propose theories of liability never at issue in a complaint in addressing allocation, a court also need not assume the validity of every allegation in a settled complaint. In *Nord-*

*strom*, the Ninth Circuit was able to look at the facts underlying the coverage and determine that this potential liability was not a problem because any liability was "wholly concurrent with D & O liability." *See Nordstrom*, 54 F.3d at 1433. We are unable to make such an assessment at this time. That is not to say, however, that such liability exists; it still ultimately must be proven that Caterpillar might have incurred an independent liability from these actions and that these actions increased the final settlement value.[11]

■ Thus, as the district court noted, Great American is entitled to attempt some measure of allocation with regard to the settlement of the *Kas* litigation. That allocation may only reflect the extent to which the settlement was larger because of claims against uninsured persons or the actions of persons against whom no claims were made. Uninsured claims may include those made against the corporation for which the corporation would face direct liability and for which the insured directors and officers could not be held liable.

### III.

■ Great American also objects to the district court's decision granting Caterpillar partial summary judgment on the issue of notice regarding settlement offers made to the *Kas* plaintiffs by Caterpillar and its various attorneys. Great American contends that these unauthorized offers voided its obli-

---

10. We reiterate that the fact that an allocation is permitted for the corporation's direct liability does not imply that Great American may go further. We believe the analysis of cases like *PepsiCo* and *Safeway* opens up more inquiry and exposure than the insurance policy in this case would permit.

11. Although neither party directly raises the issue, there is an additional question regarding on whom the burden of proof in an allocation should fall. On the one hand, insurers are normally obligated to pay for any settlements negotiated in good faith. *PepsiCo*, 640 F.Supp. at 662 (placing the burden on the insurer). However, under many D & O policies, including the one in the instant case, the insureds control the underlying litigation. That renders them not only in possession of most information regarding the suit, *see Raychem*, 853 F.Supp. at 1175–76, but

also gives them the opportunity, and the perverse incentive, to structure the underlying litigation so as to place all the fault on the backs of officers and directors and thereby ensure complete coverage. *See Slottow v. American Cas. Co.*, 10 F.3d 1355, 1359 (9th Cir.1993) (remanding case under California law where settlement reflected an almost collusive attempt by parties to bring settlement within the terms of an insurance policy). Additionally, even if the insured is presumed covered for settlements negotiated in good faith, the insured should still have to show "the existence and extent of a loss covered by a policy." *Raychem*, 853 F.Supp. at 1176. We today express no view on the merits of this debate or application to this case and leave the resolution of this problem for a more appropriate time. *See also* 2 Knepper and Bailey, *supra*, § 21–10 at 274–76 (5th ed.1993) (discussing issue).

gations under the insurance contract. First, Great American argues that Caterpillar breached a condition precedent to its insurance policy by making settlement offers without Great American's prior knowledge or consent. Alternatively, Great American claims that Caterpillar breached a duty under Illinois law to defend the underlying litigation in a reasonable and prudent manner. We disagree, for neither the insurance contract itself nor Illinois common law lend themselves to the results Great American desires.

## A.

First, Section VI.A. of the insurance contract provides that no settlement may be made without Great American's prior written consent and that the insurer "shall be entitled to full information and all particulars it may request in order to reach a decision as to such consent." Great American asserts that this language created a duty on the part of Caterpillar to inform Great American prior to making any settlement offers. Instead, Great American alleges, Caterpillar made repeated and unreasonably high settlement proposals to the *Kas* plaintiffs while falsely telling Great American that these proposals would not implicate its coverage. Great American points out that if the *Kas* plaintiffs had accepted one of Caterpillar's earlier offers without procuring Great American's assent, "Caterpillar's breach of a condition precedent would have been instantaneous and incurable."

As the district court correctly determined, Section VI.A does not help Great American. The plain and unambiguous language of that section only dictates that Caterpillar not settle or admit liability without Great American's consent. Caterpillar did neither. Caterpillar may have made offers without Great American's consent, but that activity did not, in and of itself, violate Section VI.A's requirements. Although Great American alleg-

es that it consented begrudgingly and only because circumstances left it little alternative, there is no question that it had the opportunity to say no. Great American had adequate knowledge of the circumstances surrounding the complaint at the time it consented; its consent was not coerced or based on fraudulent information.

Great American relies heavily on our decision in *Keehn v. Excess Ins. Co. of America*, 129 F.2d 503 (7th Cir.1942), in contending that Caterpillar violated its obligations under Section VI.A. In *Keehn*, a primary insurer had defended and lost a suit stemming from a car accident without informing the reinsurer. The reinsurance contract had provided that the insurer "shall notify the Reinsurer immediately after it has had notice of any accident in which this reinsurance is or may probably be involved" and that "the Reinsurer shall have the right and opportunity to associate with the Company in the defense and control of any claim or suit or proceeding relative to an accident where the claim or suit involves this reinsurance." *Id.* at 504. Relying on Illinois law and a trial court finding that no notice had been given, we held that notice of the suit was a condition precedent to any recovery on the reinsurance contract.[12]

Unlike the *Keehn* insurer who failed to provide notice, Caterpillar informed Great American of the *Kas* complaint, and Great American does not dispute this. That was enough. Great American's suggestion that we read into section VI.A's language an obligation to seek the insurer's advice and consent prior to making any offers of settlement thus derives little sustenance from *Keehn* and is, we believe, inappropriate.

■ Section VI.C presents a closer issue. That section provides that although Great American had no duty to defend Caterpillar's directors and officers (section VI.B so stipulates), Great American had the right to asso-

---

12. Great American has presented an expert study indicating that the *Kas* litigation should have settled for approximately $10.6 million. Whatever its usefulness, the study is largely immaterial to any inquiry into Great American's rights in this case. If an insurance contract contains a duty of notice and a right of association on the part of the insurer as conditions precedent and the insured violates those conditions, the contract is void regardless of the consequences. *See Keehn*, 129 F.2d at 505 (noting that the deprivation of that right "would constitute prejudice without any actual proof that the results of the litigation would have been different").

ciate with the directors and officers "in the investigation, defense or settlement of any Claim, to which this Policy may apply." As noted earlier, Caterpillar arguably engaged in a campaign of misinformation, hinting to Great American that the ultimate settlement would be lower than Caterpillar knew it would be. The question is whether this course of action violated section VI.C's "right to associate" language, thereby violating a condition precedent to any reimbursement.

▪ The district court held, and we agree, that the right to associate language of the contract is ambiguous because the level of obligation it imposes on Caterpillar is uncertain. In the absence of other indications, the district court interpreted the contract against the insurance company. We are not persuaded by Great American's response that Caterpillar was hardly an ingenue faced with arcane language in an adhesion contract: Illinois law, in its majestic equality, requires us to construe ambiguities in insurance contracts in favor of insureds, great and small alike, and against insurers who draft the insurance policies. *Outboard Marine v. Liberty Mut. Ins. Co.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 704, 607 N.E.2d 1204, 1217 (1992); *see also Transamerica Ins. Co. v. South*, 975 F.2d 321, 327 (7th Cir.1992). Given that Great American had no duty to defend Caterpillar's directors and officers, Great American did not need to know everything about the suit, nor did it request such knowledge. The correspondence between the parties indicates that Great American requested "reports, investigations, pleadings, dispositive motions, briefs, court orders, and other pertinent documents on a current basis" and that Caterpillar promised in a number of letters to keep Great American apprised of "developments as they occur." There is no dispute that Caterpillar complied with the basic request. If Great American wanted information about settlement offers before they were made, it had an obligation to say so explicitly. That obligation renders *Keehn* equally inapposite to Caterpillar's duties under Section VI.C.

Great American's references to other Illinois law regarding related insurance policy violations that release an insurer from liability are of no avail either. True, an insurer need not indemnify an insured when the insured violates a "no action" clause, which clause relieves the insurer of all obligations to pay unless the insured's liability is the result of a final judgment or comes with the express consent of the insurer. *See UNR Industries, Inc. v. Continental Cas. Co.*, 942 F.2d 1101, 1105–06 (7th Cir.1991), *cert. denied*, 503 U.S. 971, 112 S.Ct. 1586, 118 L.Ed.2d 305 (1992). Similarly, an insurer is released from its indemnity obligations when the insured violates a consent-to-settlement agreement. *See Piper v. State Farm Mutual Automobile Ins. Co.*, 1 Ill.App.2d 1, 116 N.E.2d 86 (4th Dist.1953). But neither rule compels a different result in the instant case; both are premised on violations of express contractual conditions, and Caterpillar did not do that.

### B.

▪ Great American additionally contends that Caterpillar violated a common law duty to defend and settle the claim reasonably. Great American points to a number of cases in which the courts have held that an insurer's refusal to honor its duty to defend does not absolve the insured's obligation to act reasonably and in good faith in making its own settlement. *See National Union Fire Ins. Co. of Pittsburgh v. Continental Illinois*, 673 F.Supp. 267, 273–74 (N.D.Ill. 1987); *Conway v. Country Cas. Ins. Co.*, 92 Ill.2d 388, 65 Ill.Dec. 934, 937–38, 442 N.E.2d 245, 248–49 (1982); *LaRotunda v. Royal Globe Ins. Co.*, 87 Ill.App.3d 446, 42 Ill.Dec. 219, 227, 408 N.E.2d 928, 936 (1st Dist.1980); *see also Thornton v. Paul*, 74 Ill.2d 132, 23 Ill.Dec. 541, 546, 384 N.E.2d 335, 340 (1978) ("The measure of damages for such a breach [of a duty to defend] is generally the amount of the judgment against the insured or of a reasonable settlement, plus any expenses incurred."); *Krutsinger v. Illinois Cas. Co.*, 10 Ill.2d 518, 141 N.E.2d 16, 21 (1957). This obligation follows from the general rule in Illinois "that if an insured settles an underlying claim prior to verdict, it must show that it settled an otherwise covered loss in reasonable anticipation of liability." *United States Gypsum Co. v. Admiral Ins. Co.*, 268 Ill. App.3d 598, 205 Ill.Dec. 619, 637, 643 N.E.2d

1226, 1244 (1st Dist.1994) (internal punctuation and citation omitted); *WestAmerica Mtg. Co. v. Tri–County Reports, Inc.*, 670 F.Supp. 819, 821 (N.D.Ill.1987). The general rule attempts to strike a balance between the desire to encourage early settlements and the concern that insureds may enter into inappropriate settlements in order to gain insurance coverage for otherwise uncovered losses. *United States Gypsum*, 205 Ill.Dec. at 637, 643 N.E.2d at 1244. Certainly, Great American continues, if an insured owes the insurer a duty to act reasonably when the insurer ignores its duty to defend, the insured must owe this duty when the insurer has expressed its willingness to pay and become involved in the underlying litigation and settlement process.

■ Great American's argument has some appeal but is ultimately unpersuasive. The reasonable settlement rule permits insureds left in the lurch by their insurers to recover from these insurers defense and settlement costs regardless of policy limits. *See Conway*, 65 Ill.Dec. at 938, 442 N.E.2d at 249; *Van Vleck v. Ohio Cas. Ins. Co.*, 128 Ill.App.3d 959, 84 Ill.Dec. 159, 471 N.E.2d 925 (3d Dist.1984); *LaRotunda*, 42 Ill.Dec. at 226–27, 408 N.E.2d at 935–36. The added common law protection simply ensures that this excess damage was in fact proximately caused by the insurers' refusal to defend. The instant situation did not place Great American in that jeopardy—Great American had no duty to defend. The district court thus correctly determined that the rule was inapplicable and that Caterpillar did not breach any common law duty to handle the underlying litigation in a reasonable and prudent manner.[13]

For the foregoing reasons, the decision of the district court is affirmed as modified.

AFFIRMED AS MODIFIED.

---

**13.** Great American's reliance on the implied promise to act in good faith inherent in every contract, *see Bishop v. Lakeland Animal Hosp., P.C.*, 268 Ill.App.3d 114, 205 Ill.Dec. 817, 820, 644 N.E.2d 33, 36 (2d Dist.1994); *Osten v. Shah*, 104 Ill.App.3d 784, 60 Ill.Dec. 497, 499, 433 N.E.2d 294, 296 (3d Dist.1982) does not salvage its contention either. At most, Great American has alleged stupidity on the part of Caterpillar, not the sort of bad faith necessary for a claim under Illinois law.