**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 24 1999**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ROBERT E. STAUTH, HARRY L.
WINN, KEVIN J. TWOMEY,
DONALD N. EYLER, R. RANDOLPH
DEVENING, JAMES E. STUARD,
FLEMING COMPANIES, INC.

            Plaintiffs - Appellees,

    v.

NATIONAL UNION FIRE
INSURANCE COMPANY OF
PITTSBURGH,

            Defendant - Appellant,

FEDERAL INSURANCE COMPANY,

            Defendant.

No. 97-6437

(W.D. Oklahoma)

(D.C. No. CV-96-1825-M)

---

ROBERT E. STAUTH, HARRY L.
WINN, KEVIN J. TWOMEY,
DONALD N. EYLER, R. RANDOLPH
DEVENING, JAMES E. STUARD,
FLEMING COMPANIES, INC.

            Plaintiffs - Appellees,

    v.

FEDERAL INSURANCE COMPANY,

            Defendant - Appellant,

No. 97-6438

(W.D. Oklahoma)

(D.C. No. CV-96-1825-M)

NATIONAL UNION FIRE
INSURANCE COMPANY OF
PITTSBURGH,

Defendant.

---

**ORDER AND JUDGMENT** *

---

Before **ANDERSON** and **BRORBY** , Circuit Judges, and **CAMPBELL** ,** District
Judge.

This is a diversity declaratory judgment action seeking a determination as

to two insurance coverage questions: (1) whether it is the 1993, rather than the

1996, directors and officers liability policy issued by Federal Insurance Company

that will cover any loss resulting from two securities class actions filed in 1996

against the plaintiffs; and (2) whether and on what basis any potential loss

resulting from the 1996 class action lawsuits can, at this time, be allocated

---

*This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

**The Honorable Tena Campbell, District Judge, United States District
Court for the District of Utah, sitting by designation.

between the insured plaintiff directors and officers and the uninsured plaintiff corporation.

The dispositive issue on the first question is whether the 1996 securities actions are "causally connected" (a term used in the 1993 insurance policy) to a 1993 pricing action brought by a customer against Fleming Companies, Inc. and one of its officers. If so, any loss arising from the 1996 actions must be aggregated with the loss suffered from the 1993 action, and the limits of coverage under the 1993 policy will apply. We conclude that, for coverage purposes, the 1996 class actions are not causally connected to the 1993 pricing action, and that coverage under the 1996 policy applies. We therefore affirm the district court's summary judgment in favor of the plaintiffs on this issue.

The substantive issue presented by the second question is whether the district court erred in determining how any potential loss from the 1996 class action lawsuits should be allocated between insured and uninsured plaintiffs. However, for the reasons stated below, we conclude as an initial matter that the district court prematurely decided the issue. Accordingly, we vacate the district court's grant of summary judgment on this issue.

# BACKGROUND

## I.  Factual Background

### A.  The Insurance Policies

In 1993, as it had for the past several years, Fleming, a wholesale distributor of food and related products, purchased an annual directors and officers (D&O) liability policy from Federal Insurance Company.  Under the terms of the policy, the directors and officers were covered, but the corporation itself was not.  Federal promised to pay for "all Loss . . . which [any] Insured Person becomes legally obligated to pay on account of any claims made against him . . . during the Policy Period . . . for a Wrongful Act" committed before or during the policy period.  Appellant's App. at 6.  This clause was entitled the "Executive Liability Coverage" clause.    Id.  Federal also promised to reimburse Fleming, even though Fleming was not directly insured, for any indemnification payments it made to insured directors and officers for liability incurred for wrongful acts.   This clause was known as the "Executive Indemnification Clause."   Id.  The total yearly limit on the Federal D&O policy was $25,000,000.

Fleming purchased excess insurance coverage from National Union Fire Insurance Company.  The policies issued by National Union were "follow-form" policies that adopted the "terms and conditions" in the underlying Federal policy; thus, coverage under the National Union policies is determined by looking to the

language of the Federal policy.    See Appellant's App. at 66.  The National Union

policy had a yearly limit of $25,000,000.  In 1993, then, Fleming had $50,000,000

worth of D&O insurance coverage.

In 1996, in addition to renewing the Federal and National Union policies, [1]

Fleming purchased an additional $10,000,000 of D&O insurance from Executive

Risk Indemnity, Inc. ("ERII").   [2]  This policy also appears to be a follow-form

policy, whose terms and conditions are dictated by the underlying Federal policy.

Thus, in 1996, Fleming had $60,000,000 worth of D&O insurance coverage.

## B.    The David's Litigation

In August 1993, David's Supermarkets, Inc., a customer of Fleming, filed a

lawsuit against Fleming and James E. Stuard, who was then an Executive Vice-

President of Fleming, in Texas state court (the "David's Litigation").  Between

1989 and September 1992, David's and Fleming had operated under a "cost-plus"

contract, under which Fleming agreed to sell food and related products to David's

---

[1]The renewal policies purchased in 1996 contained language largely similar, in relevant part, to the 1993 policy.  For instance, the 1996 policy also contained an "Executive Liability Coverage" clause and an "Executive Indemnification Clause," with language substantially similar to the clauses in the 1993 policy.   See Appellants' App. at 86.

[2]ERII is not participating in this appeal.  During the course of the litigation below, ERII "executed a stipulation that it will be bound by any decision" of the district court and was "dismissed without prejudice" from the litigation. Appellants' App. Tab X, at 1 n.1.

at Fleming's cost plus an agreed-upon markup. The David's lawsuit contained four causes of action. First, David's alleged that Fleming and Stuard had breached the cost-plus contract with David's, by allegedly inflating the "cost" of the food products through "paper transfers between various Fleming offices" and by failing to pass on to David's the benefit of "'rebates' and promotional discounts obtained from some manufacturers." Appellants' App. Tab J, at 4. Second, David's alleged that Fleming and Stuard "committed misrepresentation and fraud" against David's at the time it entered into the cost-plus contract, because Fleming and Stuard allegedly "had already formed an intention to overcharge David's." Id. at 6. Third, David's alleged that Fleming, Stuard, "and other unnamed parties entered into a . . . conspiracy to defraud David's." Id. Finally, David's alleged that Fleming and Stuard had violated the Texas Deceptive Trade Practices Act.

The complaint, which was amended four times (largely to increase the amount of damages sought), alleged no wrongdoing on the part of any Fleming officer or director other than Stuard, the Executive Vice-President who negotiated the agreement with David's. Also, the complaint alleged no wrongdoing on the part of Fleming, Stuard, or anyone else against any party other than David's. Furthermore, the complaint alleged no wrongdoing by anyone after September 1992. See id. at 3.

-6-

The case went to trial, and in March 1996, David's procured a $207 million verdict against Fleming. The Texas court entered judgment in the case, but the judgment was later vacated, and the case was subsequently settled for $19.9 million. [3] See Affidavit of Mary D. Manesis in Support of Federal Br., Ex. A at 1 n.1; Appellants' App. Tab K, at 65. There is no dispute that this settlement was covered under the 1993 Federal policy, and Federal paid a substantial portion of the claim, leaving just over $10 million of unexhausted coverage under the 1993 Federal policy, and just over $35 million in total 1993 D&O coverage. Appellants' App. at 436, 503.

## C.    The Class Actions

Soon after the verdict in the David's Litigation, between March and June 1996, Fleming stockholders and noteholders filed ten different class action lawsuits against Fleming and various officers and directors (the "Class Actions"). These class actions were eventually consolidated into two separate actions, one by shareholders and one by noteholders. The noteholders' class action was filed on

---

[3]In their briefs, the parties are not forthcoming about the details of this settlement agreement. Elsewhere in the record, however, we were able to learn that the settlement amount was apparently $19.9 million, of which Federal paid $14.7 million, leaving $10.3 million in unexhausted insurance under the 1993 Federal policy. See Appellants' App. at 435-36, 503 (affidavit of Michael D. Daugherty, a claims examiner for Federal's parent company, filed with the district court).

behalf of all persons who purchased one of two types of Fleming notes between December 8, 1994 and March 15, 1996. The plaintiffs chose December 8, 1994 because that was the date on which Fleming filed a registration statement with the Securities and Exchange Commission (SEC) which, because it contained no mention of the then-pending David's Litigation, was allegedly "materially false and misleading respecting Fleming's exposure to contingent liabilities." Appellants' App. Tab L, at 2. The plaintiffs chose March 15, 1996 because that was the day after the verdict in the David's Litigation was finally handed down, and on which the company's potential liability in the David's Litigation finally became public knowledge. The noteholders' class action alleges that the price of the Fleming notes was artificially inflated by Fleming's failure to disclose, in the registration statement and in subsequent SEC filings, the existence of the David's Litigation and the potential liability that lawsuit represented to the company.

The noteholders' class action names as defendants the following parties: Fleming; Fleming officers and directors Robert E. Stauth, Harry L. Winn, Donald N. Eyler, and Kevin J. Twomey; and underwriters Merrill Lynch & Co. and J.P. Morgan Securities, Inc. The suit alleges that these defendants violated § 11 of the Securities Act, and §§ 10 and 20(a) of the Exchange Act, by failing to disclose the existence of the David's Litigation. The suit does not allege wrongdoing on the part of any other person or corporation, including Stuard, and

does not seek redress for any wrongdoing prior to December 8, 1994. Also, the suit does not allege any wrongdoing on the part of the named defendants other than their failure to disclose the existence of the David's Litigation in the documents filed with the SEC.

The shareholders' class action was filed on behalf of all persons or corporations that purchased Fleming common stock between November 15, 1993 and March 14, 1996. The plaintiffs in this lawsuit chose those particular dates because November 15, 1993 was the date on which Fleming's first post-David's Litigation SEC Form 10-Q was filed, see Appellants' App. Tab K, at 26, and because March 14, 1996 was the date on which the David's verdict was handed down and on which the company's potential liability in the David's Litigation became public knowledge. The shareholders' class action alleges that the price of Fleming's stock was artificially inflated due to Fleming's failure to disclose, in documents filed with the SEC or in other public statements such as annual reports, either (1) the existence of the David's Litigation and the potential liability that lawsuit represented to the company or (2) the fact that a portion of Fleming's profits were derived from overcharging customers.

The shareholders' class action names Fleming as a defendant, as well as Fleming officers and directors Stauth, Devening, Eyler, and Twomey. The suit alleges that these defendants violated §§ 10 and 20(a) of the Exchange Act. The

suit does not allege wrongdoing on the part of any other person or corporation, including Stuard, and does not seek redress for any wrongdoing prior to November 15, 1993.

As of June 1999, both Class Actions were still pending before the United States District Court for the Western District of Oklahoma.

## II.    Procedural History

Soon after the Class Actions were filed, Fleming notified the Insurers [4] of the existence of the lawsuits.  Federal replied that it considered the Class Actions to be covered by the 1993 policy and not the 1996 policy.  Fleming objected, because nearly $15 million of Federal's $25 million annual policy limit had already been exhausted for 1993, as a result of the David's Litigation.  Federal based its position on the language of the 1993 policy which states that

> [f]or the purpose of this policy, all Loss arising out of all interrelated Wrongful Acts of any Insured Person(s) shall be deemed one Loss, and such Loss shall be deemed to have originated in the earliest Policy year in which any of such Wrongful Acts is first reported to the Company.

Appellant's App. at 8.  The policy defines "Wrongful Acts" and "interrelated Wrongful Acts" as follows:

---

[4]We refer to the insurance companies who are parties to this lawsuit—Federal and National Union—collectively as the "Insurers."

Wrongful Act means any error, misstatement or misleading statement, act or omission, or neglect or breach of duty committed, attempted or allegedly committed or attempted by any Insured Person, individually or otherwise, in the discharge of his duties to the Insured Organization in his Insured Capacity, or any matter claimed against him solely by reason of his serving in such Insured Capacity. All such  causally connected  errors, statements, acts, omissions, neglects or breaches of duty or other such matters committed or attempted by, allegedly committed or attempted by or claimed against one or more of the Insured Persons shall be deemed interrelated Wrongful Acts.

Id. at 10 (emphasis added). [5] Federal claims that the wrongful pricing practices alleged in the David's Litigation and the securities violations alleged in the Class Actions are "causally connected," and therefore are "interrelated Wrongful Acts." Thus, Federal asserts that the Class Actions are covered by the 1993 policy.

In October 1996, Fleming and several of its officers and directors filed this lawsuit, under 28 U.S.C. § 2201 and 28 U.S.C. § 1332, seeking a declaratory judgment that the Insurers have a duty to indemnify Fleming, under the 1996 D&O policy, for any loss resulting from the Class Actions. The Insurers answered by denying that the Class Actions were covered under the 1996 policy, and by asserting, among other affirmative defenses, that they were entitled to an

---

[5]The 1996 policy contains a similar statement that losses stemming from "Interrelated Wrongful Acts" shall be treated as "one Loss" which shall be "deemed to have originated in the earliest Policy Period in which a Claim is first made against any Insured Person alleging any such Wrongful Act or Interrelated Wrongful Acts." Appellants' App. at 88. The 1996 policy also defines "Interrelated Wrongful Acts" as "all causally connected Wrongful Acts." Id. at 93. "Causally connected" is left undefined in both policies.

allocation, and that they were only obligated to pay for loss directly incurred by the directors and officers, and not by the corporation itself.

On August 1, 1997, before discovery had been conducted in the case, [6] Fleming moved for summary judgment, arguing that there was no genuine issue of material fact in the case, and that the Class Actions were not causally connected to the David's Litigation. Also, Fleming argued that the Insurers were not entitled to an allocation. Both Insurers responded to Fleming's motion. National Union responded by arguing that there were genuine issues of material fact surrounding the "causally connected" inquiry, and that therefore summary judgment was improper on that issue. National Union also argued, as it does here on appeal, that any decision with regard to the allocation issue would be premature.

Federal responded by arguing that there was no need for additional discovery, and that the undisputed facts, as ascertained from the allegations contained in the David's complaint and the Class Action complaints, indicated that the two sets of litigation were causally connected. In the alternative,

---

[6]The record reflects that as of August 1, 1997, Federal had noticed the depositions of two Fleming employees and had submitted one set of interrogatories and document requests to Fleming. Fleming responded to the interrogatories and document requests on September 2, 1997. The record does not reveal whether the two noticed depositions ever took place, and the record does not reveal whether any other discovery was conducted in this case.

however, Federal stated that "[i]f . . . the Court concludes that a determination of interrelatedness [and "causal connection"] raises factual issues, Federal requests that plaintiffs' Motion be denied under Rule 56(f) and Federal be allowed to conduct discovery into such issues." Appellants' App. Tab S, at 20. Federal also argued, as did National Union, that any decision on the allocation issue would be premature.

On September 2, 1997, Federal filed a summary judgment motion of its own, asking the district court to enter summary judgment in its favor and against Fleming on the interrelatedness issue. In this motion, there was no mention of any factual dispute; indeed, Federal maintained that there were no disputed issues of fact and asked the court to enter summary judgment. Fleming responded by arguing, as it had in its own motion, that the Class Actions and the David's Litigation were not causally connected. Again, Fleming made no argument that disputed facts were in issue.

In addition, National Union took the unusual step of responding to Federal's summary judgment motion, which had sought summary judgment against Fleming . In its response, National Union argued vigorously that there were disputed factual issues with respect to interrelatedness and causal connection, and that any summary disposition of that issue would be improper.

On November 12, 1997, the district court granted summary judgment for Fleming and the directors and officers. The court made no mention of any disputed factual issues, stating only that it made its determination "[b]ased upon the parties' submissions." Appellants' App. Tab X, at 1. The court held that the pricing practices underlying the David's Litigation and the securities violations alleged in the Class Actions were not "interrelated Wrongful Acts" as that term has been defined by other courts, and that the Insurers' affirmative defense of allocation failed as a matter of law under the "larger settlement" rule.

The Insurers now appeal from this judgment of the district court. On appeal, Federal asserts that the district court erred by holding that the pricing improprieties and the securities violations were not interrelated. Federal argues that the district court ignored the policy requirement that the acts be "causally connected," and asserts that the two events are in fact causally connected and therefore are interrelated wrongful acts. Alternatively, Federal claims that section 5(a) of the 1996 policy precludes coverage for the Class Actions. [7] Federal does

_____

[7] Section 5(a) provides that Federal

shall not be liable for Loss on account of any Claim made against any Insured Person: (a) based upon, arising from, or in consequence of any circumstance if written notice of such circumstance has been given under any policy or coverage section of which this coverage section is a renewal or replacement and if such prior policy or coverage section affords coverage (or would afford such coverage

(continued...)

-14-

not argue on appeal that any outstanding factual issues exist which would prevent summary judgment on this issue. With respect to the allocation issue, Federal asserts that the district court erred by holding that the allocation defense fails as a matter of law. Federal argues that the issue was not ripe for decision, since no settlement or judgment has yet been entered in the Class Actions, and further that, even if it were proper to reach the issue, the district court should not have applied the "larger settlement" rule in this case. National Union does not appeal the district court's holding that the two sets of litigation were not interrelated; rather, National Union concentrates its appeal on the allocation issue, urging the same arguments advanced by Federal.

## DISCUSSION

We review a decision granting summary judgment _de novo_, using the same legal standard applicable in the district court. See _Wolf v. Prudential Ins. Co. of America_, 50 F.3d 793, 796 (10th Cir. 1995). Summary judgment is proper only in cases where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

---

[7](...continued)
except for the exhaustion of its limits of liability) for such Loss, in whole or in part, as a result of such notice.

Appellants' App. at 87.

-15-

### I.   Coverage Under the Policies

#### A.   Interrelated Wrongful Acts

Federal's 1993 policy aggregates all loss arising out of "interrelated wrongful acts," defined as acts which are "causally connected." Thus, the operative term at issue is "causally connected," as used in an insurance policy covering officers and directors. We are asked to define and apply that term on a factual record which both Federal and National Union, in varying degrees, considered inadequately developed for summary disposition in the district court. Although neither insurance company continues to argue on appeal that material issues of fact remain unresolved, the record before us is, at best, problematic.

Federal repeatedly urges us to focus on and compare allegations in the 1996 Class Actions with those asserted in the 1993 David's complaint. Yet the David's case has been settled and the complaint presumably dismissed pursuant to the settlement. The allegations have been overtaken by the settlement agreement, and the settlement amount covered by the policy constitutes the "loss." Among other things, we are not told which specific allegation or combination of allegations, if any, formed the basis of the settlement; whether any individual defendant in the instant suit was implicated in or even had knowledge of any matter alleged in the David's complaint; or the breakdown of the settlement figure. From a footnote in one of the district court orders in the noteholders' class action, attached to an

affidavit filed with this court in this case by Federal's counsel Mary D. Manesis, we glean information that the David's case settled for $19.9 million, and from an affidavit of a claims officer filed with the district court in this case, we learn that Federal paid $14.7 million of the settlement. This suggests, among other things, that Stuard himself was responsible for the greater loss, but Fleming, after deductibles, was responsible as a company for some of the loss. As indicated above, Stuard is not named in the Class Actions, and no allegation in those actions refer to him, and the individuals named in the Class Actions are not named in the David's suit.

Additionally, Federal directs our attention to the fact that besides the David's suit, two other Fleming customers brought actions, but Federal offers no details regarding these other suits. Federal then asserts that other Fleming customers "investigated" pricing matters, a bland reference which as easily suggests that those customers found no actionable conduct by Fleming as the opposite. See Federal Br. at 23, 25.

Furthermore, Federal furnishes no sense of scale or proportion other than to assert that Fleming is a multi-billion dollar business. We are not informed, for instance, whether the David's settlement was proportionately minuscule; whether David's is only one of hundreds or thousands of customers; whether it rates as a

large or small customer; whether it falls in a special category; or whether Stuard had sole or greater responsibility for pricing to that account.

Finally, the inquiry is further complicated by the presence of more than one, and more than one type of, securities class action lawsuit. The two Class Actions allege different facts and press different claims of fraud, and the noteholders' class action names underwriters among the defendants, while the shareholders' class action does not.

Nevertheless, Federal, on appeal, urges us to rule based on what we have before us. In doing so, it concedes that there is no case directly on point. See Federal Br. at 26. Indeed, there are two general lines of authority dealing with the term "interrelated acts" in insurance policies, neither of which applies squarely to this case. The first involves policies which do not further define the term, leaving it to the courts to ascertain the meaning. See, e.g., Eureka Fed. Sav. & Loan Ass'n v. American Cas. Co., 873 F.2d 229, 234 (9th Cir. 1989); National Union Fire Ins. Co. v. Ambassador Group, Inc., 691 F. Supp. 618, 622 (E.D.N.Y. 1988). Most courts faced with such policy language have generally taken a pro-insured approach to defining "interrelated," and have held that "legally distinct claims that allege different wrongs to different people" are not "interrelated" claims. Ambassador Group, 691 F. Supp. at 623; see also Home Ins. Co. v. Spectrum Info. Techs., Inc., 930 F. Supp. 825, 849 (E.D.N.Y. 1996) (stating that

claims which "describe wrongs which are factually and legally distinct from the prior claims" are not "interrelated"); cf. North River Ins. Co. v. Huff, 628 F. Supp. 1129, 1133 (D. Kan. 1985) (stating that a series of four separate loan transactions were not "interrelated" because they "occurred at separate times, involved different borrowers, were for different purposes, and had separate collateral").

Many of the courts that take a pro-insured approach when faced with policies which do not define "interrelated" cite, as a major reason for taking such an approach, the maxim that ambiguities in insurance policies "must be interpreted in favor of the insured." Spectrum Info., 930 F. Supp. at 845; see also Ambassador Group, 691 F. Supp. at 623 (stating that "it is axiomatic that [ambiguities in] the Policy [are] to be construed against the insurer"); cf. Atlantic Permanent Fed. Sav. & Loan Ass'n v. American Cas. Co. of Reading, Pa., 839 F.2d 212, 219-20 (4th Cir. 1988) (holding that several different acts were interrelated, in part because such a holding benefitted the insured in that case, and stating that "Virginia law requires us to construe all ambiguities in insurance contracts against the insurer and in favor of coverage"). Oklahoma insurance law, applicable in this case, contains a similar requirement. See Bratcher v. State Farm Fire & Cas. Co., 961 P.2d 828, 830 (Okla. 1998) (stating that "words of inclusion are construed against the insurer; and [] words of exclusion are

construed in favor of the insured"); Phillips v. Estate of Greenfield, 859 P.2d 1101, 1104 (Okla. 1993).

Perhaps due in part to this judicial reluctance to broadly interpret the term "interrelated" in insurance contracts, insurers began to further define the provision. For instance, some insurers have defined "interrelated wrongful acts" as acts "which have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions." Informix Corp. v. Lloyd's of London, 1992 WL 469802, at *3 (N.D. Cal. Oct. 15, 1992). Other policy definitions are even more specific, excluding coverage whenever "all or part of [any] claim is, directly or indirectly, based on, attributable to, arising out of, resulting from or in any manner related to the Insured's Wrongful Act(s)." High Voltage Eng'g Corp. v. Federal Ins. Co., 981 F.2d 596, 600 (1st Cir. 1992); see also Bendis v. Federal Ins. Co., 958 F.2d 960, 961 (10th Cir. 1992). Other companies have used the following language:

> "Interrelated Wrongful Act(s)" means Wrongful Acts which are the same, related, or continuous; or Wrongful Acts which arise from the same, related, or common nexus of facts. Claims can allege Interrelated Wrongful Acts regardless of whether such Claims involve the same or different claimants, Insureds, or legal causes of action.

Specimen Policy Forms For Lawyers Professional Liability Coverage in New York, Practising Law Institute: Litigation and Administrative Course Handbook Series 580, at 516 (1998) (quoting a policy issued by American International

Companies). Courts interpreting these specific definitions have been much more willing to find acts to be "interrelated." Some of these courts have even concluded that "but for" causation is enough, under such policy language, to render two acts "interrelated." See High Voltage , 981 F.2d at 601.

As indicated above, in the case before us, the policy language does not fit neatly into either of these two general lines of authority. The Federal policy does contain a definition of "interrelated," but this definition is not as specific as the definitions in the second group of cases discussed above. The Federal policy merely defines "Interrelated Wrongful Acts" as "causally connected" wrongful acts. This definition does not greatly advance our inquiry because, not only does it fail to parallel the language in either of the two groups of established cases, it merely poses a further question: What is the meaning of "causally connected"?

Federal argues first that the alleged acts of overpricing through 1992 and the later acts of alleged non-disclosure or concealment in reporting are part of a single, unitary plan to defraud; thus, they are causally connected at the very least. Alternatively, Federal argues that "causally connected" means any act that "flows from" another, or that would not have happened "but for" the precedent act. Finally, it argues that the plain meaning of the words compels a conclusion in its favor.

At oral argument, counsel for Federal seemed to retreat somewhat from "but for" causation, in favor of emphasis on the unitary fraudulent scheme theory. We agree that the open-ended nature of "but for" causation makes that definition unsuitable for application with any precision in this case. [8] Likewise, we regard the plain meaning argument to be unsuitable. It tends to be circular, with the answer depending on the viewpoint of the proponent.

As for Federal's main argument, that the complaints allege that the officers and directors named as defendants in the Class Actions engaged in fraudulent reporting as part of a unitary fraudulent pricing scheme, we are unpersuaded. On this record, for all the reasons outlined above, such a connection is impermissibly speculative. [9] Even if one were to compare the allegations in the David's

---

[8]Oklahoma courts appear to apply a more relaxed definition of causation in automobile insurance cases, perhaps approximating "but for" causation. See State v. Indemnity Underwriters Ins. Co., 943 P.2d 1102, 1105 (Okla. Ct. App. 1997); Wallace v. Sherwood Constr. Co., Inc., 877 P.2d 632, 633-34 (Okla. Ct. App. 1994). This may be because many automobile insurance policies contain "arising out of" language rather than "causally connected" language, and courts have interpreted "arising out of" much more broadly. See Federal Ins. Co. v. Tri-State Ins. Co., 157 F.3d 800, 804 (10th Cir. 1998); 7 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 101:54 (1998) (stating that "[t]he phrase 'arising out of' is frequently given a broader meaning than proximate cause," and may indicate "that there only need be a causal connection, rather than a proximate causal connection"). Because the case before us does not concern automobile insurance, and because the specific policy language we are interpreting in this portion of our opinion is not "arising out of" language, we consider the Oklahoma automobile insurance cases inapposite.

[9]Before the district court, Federal argued, alternatively, that it should be
(continued...)

-22-

complaint with the allegations in the Class Actions, it is impossible to isolate which allegation relates to another, or which allegations predominate.

Finally, we turn to the "flows from" argument, regarding it as suggesting a somewhat stronger link than "but for," and less speculative than the allegation of a unitary fraud theory in this case, where different times, different acts, and different people are involved. This concept comes closest to the approach suggested by one leading commentator: "[a]bsent policy or statute provisions to the contrary, the rule of causation applied in the context of insurance coverage is 'proximate cause.'" 7 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 101:40 (1998). But "[p]roximate cause must be distinguished from mere causal relation, which requires only a cause and effect relationship or sequence; proximate cause imposes an element of nearness or proximateness of the cause to the effect or result." Id. § 101.47. In the insurance context, "a cause has been said to be proximate when it sets in motion a chain of events which results in the loss without the intervention of any new or independent force." Id. § 101:45; see

---

[9](...continued)
allowed to pursue discovery into whether there was a unitary, overarching scheme to defraud both customers and investors. Federal stated that it "should be allowed to conduct discovery to ascertain whether the acts underlying the David's Action and Class Action Litigation are distinct acts or arise out of a unitary fraudulent scheme by defendants." Appellants' App. Tab S, at 21. National Union argued that "the parties dispute whether the alleged misrepresentations and failures to disclose in the Class Action Litigation form a part of a scheme to overcharge Fleming's customers." Appellants' App. Tab. T, at 8.

also id. § 101:41 (stating that "proximate cause, generally, has a different meaning in insurance cases than it has in tort cases"); Bewley v. American Home Assurance Co., 450 F.2d 1079, 1081 (10th Cir. 1971) (applying Oklahoma law and stating that "the rule of proximate cause as applied ordinarily in negligence cases does not apply in construing liability under the policy in question" (citations omitted)). Certainly the 1996 and 1993 actions relate to each other at some level, as Federal strongly argues. But whether they interrelate in the sense of being proximately causally connected is still more speculative and argumentative than not. Even if we were to compare the allegations in the complaints with respect to acts and actors, despite the fact that the David's Litigation was settled on a basis unknown to us, we would still not be able to say with any confidence that the pleadings portray a continuous unbroken sequence of events. Thus, returning to Federal's "flows from" concept, we are unpersuaded at the proximate cause level, and no other satisfactory definition of the term presents itself.

We must, of course, address the "flows from" concept—and the "causally connected" concept as a whole—from the practical standpoint of coverage, not as an abstract proposition. In the end it is a judgment call whether a broad or narrow definition of the policy language is applied to the facts before us and whether to resolve any doubts in favor of coverage and against the drafter of the policy language. In doing so, sitting in a diversity jurisdiction case where there is no

-24-

case law from the highest appellate court of the forum state directly on point, "we must in essence sit as a state court and predict how the highest state court would rule." Wood v. Eli Lilly & Co., 38 F.3d 510, 512 (10th Cir. 1994); see also Phillips v. State Farm Mut. Auto. Ins. Co., 73 F.3d 1535, 1537 (10th Cir. 1996). From our reading of the Oklahoma cases, we conclude that the Oklahoma Supreme Court would construe any ambiguity surrounding the term "causally connected" against the insurance company and in favor of coverage on this record. We do so here, and conclude that for coverage purposes the Class Actions are not "causally connected" to the David's action.

**B.     Section 5(a)**

In the alternative, Federal argues that section 5(a) of the parties' 1996 policy precludes 1996 coverage for the Class Actions. This argument fails also. In order for section 5(a) to apply, the loss in question must be covered by a prior policy. The policy states that Federal is not liable under the 1996 policy for loss for any claim "based upon, arising from, or in consequence of any circumstance," if two conditions are met: (1) "if written notice of such circumstance has been given under any policy of coverage of which this coverage section is a renewal or replacement," and (2) "if such prior policy or coverage section affords coverage (or would afford such coverage except for the exhaustion of its limits of liability)

-25-

for such Loss." Appellants' App. at 87. Without expressing any opinion as to whether the first of these two conditions precedent is met, we think the second condition is certainly not satisfied. We hold directly above that any loss resulting from the Class Actions is covered under the 1996 policy, and not the 1993 policy. Thus, no "prior policy" affords coverage for any Class Action losses, and therefore section 5(a) is of no help to Federal.

We conclude, therefore, that any Class Action losses are covered under the parties' 1996 policy, rather than the parties' 1993 policy, and that the district court correctly entered summary judgment on this point in favor of Fleming and the directors and officers.

## II.    Allocation

Both Federal and National Union appeal from the district court's grant of summary judgment on the allocation issue. The Insurers argue first that the district court's summary judgment as to allocation is premature in this case because no settlement has yet been reached in the Class Actions, and therefore there is nothing to allocate at this point. They argue further that even if the district court's decision was not premature, it was incorrect, because the district court should have applied the "relative exposure" rule rather than the "larger settlement" rule. We agree with the Insurers that the district court's allocation decision was premature.

The allocation problem arises when both the uninsured corporation (or other uninsured parties) and the insured directors and officers are found liable in a securities lawsuit. In such cases, it is often difficult to determine the amount of the eventual award attributable to the directors and officers (and therefore subject to the policy). This determination is made especially difficult where cases are settled out of court, and one lump sum is paid to the plaintiffs.

The parties' policy provides only limited guidance on allocation issues. The 1996 policy, which, as we hold above, covers any loss resulting from the Class Actions, states that the Insurers must compensate the Fleming directors and officers (or Fleming itself, if Fleming indemnifies the directors and officers) for "loss" covered under the policy; the policy defines "loss" as "the total amount which any Insured Person becomes legally obligated to pay on account of each Claim . . . made against them" and covered under the policy. Appellants' App. at 86, 93 (emphasis added). In addition, the 1996 policy contains an allocation clause, which requires both parties to "use their best efforts to agree upon a fair and proper allocation." Appellants' App. at 90. This "best efforts" policy language "requires an allocation analysis, but not necessarily an allocation." Safeway Stores, Inc. v. National Union Fire Ins. Co., 64 F.3d 1282, 1288 (9th Cir. 1995).

Courts faced with the allocation problem have applied one of two different rules. The "relative exposure" rule allocates settlement amounts "according to the relative exposures of the respective parties to the [suit]." PepsiCo, Inc. v. Continental Cas. Co., 640 F. Supp. 656, 662 (S.D.N.Y. 1986). "The relative exposure rule . . . envisions a somewhat elaborate inquiry into what happened in a settlement and who really paid for what relief." Caterpillar, Inc. v. Great American Ins. Co., 62 F.3d 955, 961 (7th Cir. 1995). The "larger settlement" rule, on the other hand, involves a simpler inquiry. This rule allows allocation of settlement costs "only where th[e] settlement is larger because of the activities of uninsured persons who were sued or persons who were not sued but whose actions may have contributed to the suit." Caterpillar, 62 F.3d at 960. Allocation is not allowed under this rule where the uninsured party's liability is "concurrent with the liability" of the insured parties, because in such cases, the uninsured party's conduct has made the settlement no larger. See Safeway Stores, 64 F.3d at 1288. The only two federal circuits to address the allocation issue have applied the larger settlement rule to the facts before them. See id.; Caterpillar, 62 F.3d at 962; Nordstrom, Inc. v. Chubb & Son, Inc., 54 F.3d 1424, 1433 (9th Cir. 1995).

The Insurers argue, however, that the allocation landscape was altered in December 1995, when Congress passed the Private Securities Litigation Reform Act of 1995 (PSLRA). Pub. L. No. 104-67, 109 Stat. 737 (1995). That statute

-28-

abolished joint and several liability in private securities lawsuits, except in cases where the defendants committed knowing violations of the securities laws. Each liable person, under the statute, is liable only for that portion of the judgment for which they are responsible. 15 U.S.C. § 78u-4(g)(2)(B)(i) (1997) (stating that persons found liable in private securities suits "shall be liable solely for the portion of the judgment that corresponds to the percentage of responsibility of that . . . person"). The statute provides guidelines for the factfinder to follow in determining the discrete percentages of responsibility attributable to the various liable defendants in the lawsuit. Safeway Stores, Caterpillar, and Nordstrom were all decided earlier in 1995, before the passage of the PSLRA, and therefore, the Insurers argue, these cases do not take into account the statutory pronouncements of the PSLRA.

The parties do not seem to dispute that the PSLRA applies to the Class Actions, because the Class Actions were filed in 1996, after the passage of the PSLRA. Thus, if the Class Actions go to trial, the factfinder will, in accordance with the statute, be required to determine the exact percentages of fault attributable to the various defendants. In such a situation, the culpable directors and officers will each be assigned a relative percentage of fault, and thereby also assigned to pay a relative percentage of the judgment. Thus, in securities suits covered by the PSLRA that actually go to trial, the entire question regarding the

proper allocation rule is rendered moot. That is, unless the Class Actions settle before trial, we need not determine whether the larger settlement rule or the relative exposure rule is the better one.

The district court, without mentioning the PSLRA, entered summary judgment for Fleming and the directors and officers on the allocation issue. Relying on the cases from the Ninth and Seventh Circuits which have applied the larger settlement rule, the district court determined that the larger settlement rule should apply in this case as well. The court then stated that "an actual settlement is not required to determine the allocation issue. The Court finds the defendants' affirmative defense of 'allocation' fails as a matter of law." Appellants' App. at 650-51. In making the determination that the affirmative defense failed as a matter of law, the district court was implicitly stating, without the benefit of a settlement or judgment to guide it, that Fleming (or other named or unnamed uninsured parties) could not possibly be found separately liable in the Class Actions as those lawsuits had been pled.

In determining whether the district court properly granted declaratory relief in this case, we are constrained by the proposition that "the oldest and most consistent thread in the federal law of justiciability is that federal courts will not give advisory opinions." Flast v. Cohen, 392 U.S. 83, 96 (1968). Courts have long struggled to reconcile the rule against advisory opinions with their authority

to issue declaratory relief. The Declaratory Judgment Act, passed in 1934, expressly applies only to "case[s] of actual controversy." 28 U.S.C. § 2201(a). This statutory phrase incorporates Article III's requirement that federal courts only entertain "cases" or "controversies." See Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 239-40 (1937).

However, declaratory judgments may issue under the statute, without offending the Constitution, even in cases where some contingencies exist. For instance, in Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270 (1941), the Court held that a declaration could issue in a case brought by an insurance company against a third party, even though any claim the third party might have against the insurer was contingent upon "(1) his obtaining a final judgment in state court against the insured, and (2) the insured's failure to personally satisfy the judgment." Kunkel v. Continental Cas. Co., 866 F.2d 1269, 1274 (10th Cir. 1989) (discussing Maryland Casualty). The Supreme Court, in Maryland Casualty, set forth the test for determining whether a dispute was appropriate for declaratory relief:

> The difference between an abstract question and a "controversy" contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having

-31-

> adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

Maryland Cas. Co., 312 U.S. at 273. In the decades since Maryland Casualty, courts have usually been willing to decide questions relating to the existence of coverage under an insurance policy, even though such questions are often contingent on several factors, including whether a court in the underlying litigation finds the insured party liable. See Kunkel, 866 F.2d at 1275; Rubins Contractors, Inc. v. Lumbermens Mut. Ins. Co., 821 F.2d 671, 674-75 (D.C. Cir. 1987); ACandS, Inc. v. Aetna Cas. & Sur. Co., 666 F.2d 819, 822-23 (3d Cir. 1981); see also 10B Charles Alan Wright et al., Federal Practice and Procedure § 2760 (1998).

For instance, in this case, there is no question that the first part of the case—the coverage issue—presents a live controversy despite the unsatisfactory manner in which it is framed by the parties, and neither our opinion nor the district court's opinion on this point is unconstitutionally advisory. This is so despite the presence of several contingencies, including whether the insured directors and officers are found liable in the Class Actions, and whether any settlement or judgment in the Class Actions exceeds $10.7 million (the unexhausted amount of coverage available under the 1993 policy).

However, we are convinced that the second part of the case is at least one step removed from the paradigmatic insurance declaratory relief case. The

-32-

allocation issue presents additional contingencies not present in the other portion

of the case. For our opinion on the allocation issue to have any relevance, parties

other than the insureds must be found liable in the underlying litigation. These

parties may include Fleming itself, the underwriters named in the noteholders'

Class Action, or other unnamed parties. [10] Furthermore, if the underlying Class

Actions go to trial, we need not decide the allocation questions because the case

will be governed by the procedures set forth in the PSLRA. These additional

contingencies increase the odds, beyond those usually found in insurance

declaratory relief cases, that our allocation opinion could turn out to be advisory.

We stated in Kunkel that "[c]ertainly a situation may be hypothesized where the

---

[10]The district court held that the larger settlement rule was the proper allocation rule in this case, and went on to enter summary judgment for Fleming and the directors and officers because, it held, the Insurers' allocation counterclaim failed as a matter of law under the larger settlement rule. Presumably, the district court based this holding on the assumption that no uninsured party could, under the allegations in the Class Actions, be held separately liable for the securities fraud. We fail to see how summary judgment would be proper in this case even if we were to assume that the district court was correct to apply the larger settlement rule. The noteholders' Class Action, for instance, names as defendants certain underwriters, who are undisputedly not insured by the policies in question. See Appellant's App. at 310. Alternatively, it is certainly conceivable that Fleming itself could be found liable on some of the securities claims, even if the directors and officers are not, due to differing standards of liability and the availability of certain defenses to the directors and officers. On the record before us, we cannot say at this point that, as a matter of law, no uninsured party can be found separately liable for securities fraud in the Class Actions. Thus, even if we were to assume (which we do not) that the district court was correct to apply the larger settlement rule, we cannot see how summary judgment would have been proper on the allocation issue.

number of contingencies or the improbability of their occurrence is so great that a court would be powerless to render a decision." Kunkel, 866 F.2d at 1274-75. We think that an opinion on the allocation issue in this case, at least before any settlement or judgment has been rendered, would be premature and, because of the many contingencies involved, would be advisory in nature. Phrased in terms of the Maryland Casualty test, we do not think that, under all the circumstances presented here, there is a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

Also important to our conclusion is the unusual procedural posture of this portion of the case. The allocation issue was presented to the district court as an affirmative defense, pled by both Insurers when they answered Fleming's Complaint. [11] See Appellees' Supp. App. at 31, 46. However, before the district court and on appeal, both Insurers have implicitly argued that their own counterclaim was premature, and at least one of the Insurers has explicitly made the argument on appeal that the district court's opinion in response to its own

---

[11]At oral argument, counsel for Federal stated that the Insurers pled the affirmative defense only to avoid potential insurance bad faith claims, in the event that a settlement was reached, without their participation, which was unpalatable to the Insurers. Federal's counsel stated at argument that the Insurers considered it a "mandatory exercise" to plead the affirmative defense, while "recognizing that it was something which should be decided, if at all, after the policy provisions had been complied with with respect to good faith meeting and negotiation, and after a settlement had been arrived at."

counterclaim was advisory. <u>See</u> Federal Br. at 36-37 (stating that "there is no actual controversy between the parties regarding allocation").

Finally, neither side has cited to us, nor can we find, any case in which allocation questions were decided prior to an actual settlement or judgment in the underlying litigation. All of the courts which have dispositively dealt with allocation issues have done so with the assistance of a settlement or judgment to guide them. <u>See</u>, <u>e.g.</u>, <u>Safeway Stores</u>, 64 F.3d at 1285; <u>Caterpillar</u>, 62 F.3d at 959; <u>Nordstrom</u>, 54 F.3d at 1428; <u>Piper Jaffray Cos. v. National Union Fire Ins. Co.</u>, 38 F. Supp. 2d 771, 773 (D. Minn. 1999); <u>PepsiCo</u>, 640 F. Supp. at 658. Simply stated, no court has ever reached the issues Fleming and the directors and officers ask us to reach here, in the absence of a settlement or judgment to guide the analysis and remove several of the contingencies hanging over this portion of the case. We decline the invitation to become the first court to do so.

In sum, the allocation issues in this case do not present a controversy immediate enough to warrant the issuance of a declaratory judgment. Any opinion we might issue with regard to these questions would be premature and in the nature of an advisory opinion. Therefore, we vacate that portion of the district court's opinion dealing with allocation, and remand the case to the district court with orders to hold the case in abeyance until the Class Actions have either been settled or dismissed or have proceeded to judgment.

**CONCLUSION**

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment as to coverage, VACATE the district court's opinion and judgment as to allocation, and REMAND for further proceedings consistent with this opinion. It is so ordered.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge